## No. 18,129.

LILLIAN MARJORIE DIERNFELD *v.* PEOPLE OF THE STATE OF COLORADO IN THE INTEREST OF CAROL ANN DIERNFELD, ET AL.

(323 P. [2d] 628)

Decided March 3, 1958.

Messrs. TARTER & TARTER, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. JOHN W. PATTERSON, Assistant, for defendants in error.

*En Banc.*

MR. JUSTICE DAY delivered the opinion of the Court.

THIS was an action to determine the dependency of a minor child brought in the county court of El Paso County by the juvenile probation officer of said county. The petitioner was Thomas E. Shaw and will be referred to by name. The respondent in the county court was the mother of the child, and she brings the case to this court by writ of error complaining of the orders of the county court declaring the child dependent and neglected. She challenges the further orders of the court depriving her of her parental rights and ordering the child to be placed out for adoption through the Lutheran Placement Agency of Denver, Colorado.

The child in whose interest these proceedings were instituted was born out of wedlock. The mother was pregnant upon entering the state penitentiary. So that she could give birth to the child under proper medical care not available at the state penitentiary, she was placed on parole after commutation of her sentence by the Governor. In February, 1956, when the child was a year and a half old, the mother was arrested on a charge of forgery and again sent to the penitentiary. Before incarceration she took the child to *her* mother for care until her release from prison. There is no contention that the grandmother was not giving the child a good home, in clean and wholesome surroundings. She was properly fed and clothed by the grandmother, who was being assisted financially by two sons, half brothers of the mother. The probation officer admits he made no investigation of the home, had never been in it, and did not interview the grandmother or brothers concerning their ability to take care of the child or their future plans. The proceeding was admittedly brought and carried to its conclusion on the sole assumption that since the child was not being cared for by either its father — whose whereabouts is unknown — or its mother — who is in the

penitentiary — that it was in fact neglected and dependent.

The entire tenor of the proceedings was that it made no difference whether the grandmother was caring for the child or that it was receiving good care in a fine home. The court declared that the sole issue was whether or not the child was receiving *parental* care. Thus the trial was commenced and conducted upon an erroneous conception of the law and of the duties of the court in dependency proceedings. On such a premise it was obvious that the rulings and the remarks made by the court compounded the error.

One can best conceive the prejudice which induced the filing of the petition in dependency by the "speech" of the juvenile officer Shaw made before the jury over the objection of counsel. We quote his lengthy statement: "Because of the conditions under which the first child was brought into this world which constituted illegitimacy, she relinquished it, gave it away. The same conditions were present at the birth of this little girl. After repeated probationary status from Denver and she could not adjust to a normal state of life nor conduct her behavior in such a manner that would be healthy for our society, she was committed to the State Prison. She was released from the prison because they did not have medical facilities for delivery of this child. She was put on parole by the State but she could not adjust herself. After the delivery of this child she again committed offenses which constituted the District Court to commit her the second time to the State Prison. And being informed through and by the District Court because of her being committed to the State Prison that the child was left with the grandmother, I thought in the interest of this child and the possibility of the mother returning to the behavior pattern she had so vividly expressed in the past, that, too, there being hundreds of people physically unable to bring children into this world, and they have longed for years for such a little child in their home, that

this little child should have every benefit and opportunity that any little child in the world should have. And it could not under the circumstances that it was now in ever have those privileges. I filed the petition."

■ It was error for the court to permit the statement on several grounds. Much of it was predicated upon hearsay and not the personal knowledge of the witness; it contained numerous immaterial matters; it was merely an expression of opinion and set forth grounds for commencing the dependency action wholly outside of the statute. C.R.S. '53, 22-1-1.

Taking up the theme announced by Shaw, the court on half a dozen occasions ruled that the child's surroundings and well-being and care were not material. Following are some examples of the court's rulings:

"The petition is directed towards the parents and not towards the grandparent and her [sic] uncle. It does not have to be shown what others may have done what the parents should have done. It is what the parents have not done for the child, that is the sole issue."

And again:

"I don't think this [referring to the care being received by the child in the grandmother's home] is any issue in the case because at no time has there been any indication or claim that the child was improperly fed or improperly clothed, or anything else, except that it was done * * * by a person who had no legal authority or custody or guardianship. And I don't think there has been any issue on that question raised."

■ To be sure it was an issue raised by the mother. The court's ruling that it was necessary for the mother to obtain the consent of the court before putting the child in care of the grandmother was error, as was the pronouncement by the court that the grandmother was required to be appointed by the court as the legal guardian. All of these rulings show a misconception by the court of the law applicable to the case. Clearly it is *not* the law that before a child can be placed by a parent

in temporary custody of a relative permission must be first obtained from the court. Nor is it the law that custody orders must issue, and that the court must appoint the person selected by the parent officially as guardian. We find no case that so holds, and none is cited. It is well settled in this jurisdiction that evidence of the child's physical care, surroundings and well-being is competent and material evidence to the issues in a dependency action. If, through arrangements made by the parent, the child is being properly cared for by those who have a genuine interest in its welfare, the fact that the mother has obtained such help and has sought out and procured proper care for the child is evidence that the parent is not neglecting the child. It is also evidence of proper concern for the child's welfare and tends to establish that she was not abandoned or left homeless. If the person in whose care the child is placed assumes the responsibility, is not being imposed upon, and there is no dispute among persons entitled to the custody of the child, the jurisdiction of the court cannot be invoked and the state is not concerned in the matter. To be sure the state has an interest in the child, but its interest is based upon the statutory grounds of dependency, neglect or abandonment, and in order for the child to be snatched from a blood relation who is giving her love and care, there certainly must be some showing as to the necessity therefor.

To point out the misconception of the court in this proceeding, we find the court, *after* the jury had returned its verdict and before being discharged, pronouncing this novel philosophy:

"I do not know what eventual disposition I may make with respect to the placement of the child but I do know that every child we have had available for adoption we have nine or ten parents ready and willing and anxious to take them."

Apparently the court was more concerned with providing sufficient children for adoption by childless

couples than in safeguarding the rights of natural parents, and assumed the attitude that any one who is convicted of a felony is fair game for the accomplishment of this purpose. The court was not alone in this viewpoint because, as noted above, the juvenile officer also said: "* * * there being hundreds of people physically unable to bring children into this world, and they have longed for years for such a little child in their home, and this little child should have every benefit and opportunity that any little child in the world should have. * * *"

These are popular sentiments, expressed in cryptic words, but they have no part in a dependency proceedings and cannot justify either the court or its officers in depriving the mother of her natural rights.

It is not denied that the plaintiff in error was twice convicted of felonies, but this is not alone sufficient to invoke the jurisdiction of the county or juvenile court in dependency matters. We cannot hold that every convicted felon, by that fact alone, loses all parental rights in children. Social workers and mothers may wish that parents had turned out better or that their children had received a "better break" in life. But not every sin of the father or mother is visited upon the children. It is not one of the punishments prescribed by law that conviction of a felony works also for forfeiture of parental rights. In *Ziemer v. Wheeler*, 89 Colo. 242, 1 P. (2d) 579, this court said:

"* * * The trial court took judicial notice of the fact that plaintiff had, at some time, been convicted of a violation of the prohibitory law of this state, but this fact alone would not justify it in taking from the parent the custody and control of his children."

Touching upon the proposition of the legality of the plaintiff's arrangement for temporary custody of her child by leaving it with the grandmother, this court has held, and we again hold, that a parent may make such arrangements for the care of his child as circumstances

may demand without order of court by guardianship or otherwise. *Peterson v. Schwartzmann,* 116 Colo. 235, 179 P. (2d) 662.

Some excerpts from *Peterson v. Schwartzmann,* supra, would be apropos since in that case the parent had placed the child in a nursery home. Commenting upon the evidence presented in support of dependency, the court summarized the testimony as follows: "* * * that plaintiff in error [the father] did not provide a home for the child and made no attempt to provide it with a home, but placed the child among strangers where she had never been before, where she knew no one, * * * [that the] nursery [was] far from its father and mother, that they did not see it often and that the child had no love and training that parents should give a child; * * *."

The court commented further that: "* * * There is no testimony by any witness to suggest that such witness had visited or even seen the home where the child was being cared for or had the slightest knowledge as to her surroundings or care or the affection shown her. * * *"

Commenting on evidence almost identical to the evidence in the case at bar, the court further said:

"* * * By ample and undisputed evidence it was established that the home where the child was placed was clean and well kept, and that Mrs. Cooper, who was in charge of the home, served good food and kept the child in a satisfactory way. * * * Another woman testified that she had kept her child there for two years and that Mrs. Cooper was very capable, very cleanly, and provided a good substitute for a permanent home, * * *."

On this state of the record the court ruled: "* * * there was no evidence submitted having the slightest probative force to establish the allegations of the petition as to dependency and with substantial and undisputed evidence refuting them.

"The state humane officers who participated in the proceeding and verified the petition in dependency without furnishing one word of testimony to support it, *and*

*apparently without ever investigating or seeing the place where the child was kept* or having knowledge as to its dependency, went beyond the proper function of their office. * * *" (Emphasis supplied.)

It appears to us that this case, wherein care by a maternal grandmother was being given the child, presents a stronger case against a finding of dependency than did *Peterson v. Schwartzmann,* supra.

It is apparent from a reading of this record that the petitioner Shaw was anticipating the future, and both he and the court were convinced that when the mother is released from prison and attempts to take over her natural rights and the legal obligations of motherhood she will fall into previous behavior patterns and that such conduct will be detrimental to the welfare of the child. If such prediction proves to be true and if at that time the circumstances show that the child is being reared by the mother in an unsatisfactory environment and is not being given proper care and attention, then there may be grounds to invoke the jurisdiction of the court, which then can take whatever steps are deemed advisable in the best interests of the child. Speculation as to future conduct has no place in these proceedings.

The judgment is reversed and the cause remanded with directions to vacate the order and judgment of the court decreeing the child dependent and neglected and the other orders issued subsequent thereto for the care and custody of the child, and to restore the child to the grandmother from whose care she should never have been removed.