IN THE MATTER OF THE PARENTAL RIGHTS AS TO SYMANTHA RENAE CARRON, SHAWN WHITNEY, Appellant, *v.* TERESA C. PINNEY, Respondent.

No. 30377

April 9, 1998                                    956 P.2d 785

*Frederick A. Santacroce,* Las Vegas, for Appellant..

*D. Bruce Anderson,* Las Vegas, for Respondent.

## OPINION

*Per Curiam:*

This court is asked to determine whether a district court can consider a father's conduct during the mother's pregnancy as evidence of his intent to abandon the child. Having reviewed the

briefs and having had the benefit of oral argument of counsel, we affirm the district court's order terminating appellant's parental rights, and hold that a district court may consider a father's pre-birth conduct as a factor establishing jurisdictional and dispositional grounds in termination of parental rights proceedings.

## STATEMENT OF FACTS

Appellant Shawn Whitney ("Shawn") contests the termination of his parental rights to his biological daughter, Symantha Renae Carron ("Symantha"). Symantha was born out of wedlock on May 29, 1996. Before Symantha's birth, her natural mother, Veronica Carron ("Veronica"), had been involved in a relationship with Shawn.

On September 14, 1994, Veronica, an eighteen-year-old high school senior, moved in with Shawn and his family in New Brunswick, New Jersey. Veronica lived with the Whitney family for a year-and-a-half.

On October 27, 1995, while Veronica was living at the Whitney house, she found out that she was pregnant. She immediately believed Shawn to be the father.

Veronica testified that she told Shawn and his mother Linda Whitney ("Linda") that she was pregnant on October 27, 1995, the same day that she took an at-home pregnancy test. Both Shawn and Linda dispute the time frame within which they learned of Veronica's pregnancy. The district court, however, determined as a factual matter that Linda and Shawn were aware of Veronica's pregnancy prior to December of 1995.

Veronica alleges that on November 7, 1995, she ended her relationship with Shawn because she found heroin in his wallet. Shawn denies the incident.

On December 21, 1995, Veronica moved from New Jersey to Las Vegas to live with her mother. Thereafter, Veronica contacted Jo McLaughlin ("Jo"), managing director of the New Hope Child & Family Agency for the State of Nevada, to arrange for adoption of the baby.

According to Jo, on January 10, 1996, she informed Shawn that he was being named as "putative father" of Veronica's child, that the adoption process had begun, and that his consent to the adoption was necessary. At trial, Shawn denied this conversation ever took place.

Jo testified that she then contacted Linda on January 25, 1996, and informed her that if she had an interest in adopting the baby, an investigation was required. Despite her conversation with Jo, Linda maintained that "she still felt [the pregnancy] was a hoax."

In early February 1996, Veronica was hospitalized at University Medical Center in Las Vegas for surgical removal of an ovarian cyst. During this confinement, she met respondent Teresa

Pinney ("Teresa"), an operating technician at the hospital. Veronica informed Teresa that she was pregnant and that she was putting the baby up for adoption. After the surgery, Teresa and Veronica discussed the possibility of allowing Teresa to adopt the baby. Veronica testified that she was strongly in favor of this proposal.

On February 16, 1996, Teresa contacted Jo, who then initiated the adoption process. Teresa maintained close involvement with Veronica throughout the pregnancy.

On March 6, 1996, Jo and Veronica called Linda and Shawn, at which time Shawn allegedly told Veronica that "he would back her on whatever she decided to do." Believing that Shawn supported Veronica's decision, Jo testified that she went forward with the adoption process.[1]

On May 29, 1996, Veronica gave birth and Symantha was released from the hospital into Teresa's custody. Symantha is now over sixteen months of age and still resides with Teresa.

On June 25, 1996, Teresa filed a petition for the termination of Shawn's parental rights. Although Shawn did not file a written opposition to Teresa's petition, he appeared at the termination hearing on August 28, 1996. Given his opposition, the court ordered Shawn to submit to DNA testing to confirm paternity. The matter was continued to December 17, 1996.

In July of 1996, Veronica visited Shawn and Linda in New Jersey. According to Shawn, he told Veronica that he would fight to maintain custody of his daughter. On August 30, 1996, Shawn filed a motion for temporary custody of Symantha or, in the alternative, for visitation.

On February 6, 1997, the district court heard the pending motions. Genetic testing confirmed that Shawn was, in fact, Symantha's biological father and drug tests ordered by the court were negative. The court denied Shawn's motion for visitation.

On April 24, 1997, following an evidentiary hearing held April 7, 1997, the district court entered an order terminating Shawn's parental rights.

Shawn appeals on the contention that the district court improperly relied on his conduct during Veronica's pregnancy to determine parental abandonment. We conclude that Shawn's contention lacks merit.

*Standard of Review*

The power to terminate parental rights is an "awesome

---

[1]Jo testified that she unsuccessfully attempted to call Shawn and Linda on March 8, March 11, March 13, and March 15, 1996, to discuss the adoption proceedings.

power." Champagne v. Welfare Division, 100 Nev. 640, 645, 691 P.2d 849, 853 (1984). Consequently, this court must carefully scrutinize actions of this nature. Kobinski v. State, 103 Nev. 293, 296, 783 P.2d 895, 897 (1987). This court will uphold termination orders if they are based on substantial evidence, and will not substitute its own judgment for that of the trial court. *Id.*

In order to terminate a parent's rights, both jurisdictional and dispositional grounds must be satisfied. *Id.* The jurisdictional aspect of an action for termination involves a specific fault or condition directly related to the parent; whereas the dispositional aspect of the action focuses on the best interests of the child. *Champagne,* 100 Nev. at 647-53, 691 P.2d at 854-58. Both grounds must be established by clear and convincing evidence. *Id.*

*Whether jurisdictional grounds for termination were established by clear and convincing evidence*

NRS 128.105 sets forth grounds for terminating parental rights.[2] The statute specifically states that a parent need only demonstrate one of the enumerated grounds to support a termination order. The district court in this case, however, found three separate jurisdictional grounds under NRS 128.105 for the termination of Shawn's parental rights: (1) abandonment, (2) risk of serious injury to the child if returned to the home of the parent, and (3) token efforts by the parent. Because the district court explicitly considered Shawn's pre-birth conduct in its abandonment inquiry, we confine our review to that issue.

---

[2]NRS 128.105, provides, in pertinent part, that an order of the court for termination of parental rights is appropriate where:

    1.   The best interests of the child would be served by the termination of parental rights; and

    2.   The conduct of the parent or parents demonstrated at least one of the following:

    (a) Abandonment of the child;

    (b) Neglect of the child;

    (c) Unfitness of the parent;

    (d) Failure of parental adjustment;

    (e) Risk of serious physical, mental or emotional injury to the child if he were returned to, or remains in, the home of his parent or parents;

    (f) Only token efforts by the parent or parents:

        (1) To support or communicate with the child;

        (2) To prevent neglect of the child;

        (3) To avoid being an unfit parent; or

        (4) To eliminate the risk of serious physical, mental or emotional injury to the child; or

    (g) With respect to termination of the parental rights of one parent, the abandonment by the parent.

1. *Abandonment*

In its termination order, the district court found that "the conduct of the respondent throughout the pregnancy, and immediately after the birth, is evidence of his intent and may be used to determine whether he has a settled purpose to relinquish all claims to the child." The district court focused on the fact that Shawn did not assert his parental rights to Symantha until after Teresa filed the termination petition. The district court also found that, throughout Veronica's pregnancy, Shawn "had nothing to do with this child, wanted nothing to do with this child, expended no efforts to establish or maintain a parental relationship, and . . . specifically stated that he would support the natural mother's desire to have the child placed with [Teresa]." Accordingly, the district court concluded that the jurisdictional ground of abandonment had been established by clear and convincing evidence.

Shawn argues that it was improper for the district court to rely on his conduct during Veronica's pregnancy as evidence of his intent to relinquish all claims to the unborn child. Instead, he asks this court to focus on his post-birth actions which he contends demonstrate his lack of intent to abandon Symantha.

Abandonment of a child, as defined in NRS 128.012:

> 1. [A]ny conduct of one or both parents of a child which evinces a settled purpose on the part of one or both parents to forego all parental custody and relinquish all claims to the child.
> 2. If a parent or parents of a child leave the child in the care and custody of another without provision for his support and without communication for a period of 6 months, or if the child is left under such circumstances that the identity of the parents is unknown and cannot be ascertained despite diligent searching, and the parents do not come forward to claim the child within 3 months after he is found, the parent or parents are presumed to have intended to abandon the child.

In determining abandonment, this court has stated that parental intent is the decisive factor and may be shown by the facts and circumstances of each case. Smith v. Smith, 102 Nev. 263, 266, 720 P.2d 1219, 1221 (1986).

We conclude that a district court may consider a father's pre-birth conduct as one factor in its abandonment inquiry. The language of NRS 128.012(1) allows a court to consider "any [parental] conduct" when determining whether the parent intended to abandon the child. We conclude that the term "any conduct" in NRS 128.012 encompasses a father's actions during the mother's pregnancy. Accordingly, on the basis of the plain language of the statute, we conclude that the district court prop-

erly considered Shawn's pre-birth conduct in determining whether he abandoned his daughter for purposes of NRS 128.012. *See* City Council of Reno v. Reno Newspapers, 105 Nev. 886, 891, 784 P.2d 974, 977 (1989) (holding that "when the language of a statute is plain and unambiguous, a court should give that language its ordinary meaning and not go beyond it".").

While we do not hold that a father's pre-birth conduct alone justifies termination of his parental rights, we conclude that it can serve, at least in part, as the basis for a finding of any jurisdictional or dispositional grounds pursuant to NRS 128.105.[3] The holding we articulate here is consistent with case authority from other jurisdictions pursuant to which consideration of a father's pre-birth conduct appears to be the general trend.[4]

*Whether dispositional grounds for termination were established by clear and convincing evidence*

The district court relied on the well-settled principle announced by this court in *Champagne v. Welfare,* that "[i]f under no reasonable circumstances the child's best interest can be served by sustaining the parental tie, dispositional grounds for

---

[3] In the instant case, the district court determined that the existence of additional jurisdictional and dispositional grounds mandated termination of Shawn's parental rights.

The district court concluded that Shawn was an unfit parent because of his history of drug use, emotional and mental illness, and domestic abuse. Additionally, the district court concluded that Shawn displayed only token efforts towards supporting the child, avoiding being an unfit parent, and eliminating the risk of serious physical, mental or emotional injury to his child. Consequently, while Shawn did assert his rights to Symantha, the district court noted that his efforts were made only after Teresa filed a petition to terminate his parental rights, and as such, Shawn's "willingness to now assume parental responsibilities has come at a time too late in this minor child's life. . . ." Accordingly, Shawn's pre-birth conduct notwithstanding, the district court found sufficient jurisdictional grounds to justify termination in the instant case. *See* NRS 128.105(2) (providing that the conduct of the parent need only demonstrate *one* of the enumerated jurisdictional grounds to support a termination order) (emphasis added).

[4] *See* In re the Adoption of Baby E.A.W., 658 So. 2d 961, 964 (Fla. 1995) (holding that father's lack of emotional support toward the mother during her pregnancy could form a basis for a finding of abandonment); Adoption of Michael H., a Minor, 898 P.2d 891, 897 (Cal. 1995) (holding that a father's conduct before and after the child's birth must be considered in deciding whether an unwed father is entitled to constitutional protection); In Re Baby Girl Eason, 358 S.E.2d 459 (Ga. 1987) (holding that unwed fathers possessed an "opportunity interest" to develop a relationship with their children, which began at conception and could be lost if the father did nothing to further it).

termination exist." *Id.* at 652, 691 P.2d at 858. In sum, the dispositional inquiry concerns the child's best interest.

The district court concluded that terminating Shawn's parental rights would be in Symantha's best interests. We conclude that this decision is supported by substantial evidence in this case. Accordingly, we affirm the decision of the district court.

SPRINGER, C. J., dissenting:

Amidst very tough competition, I nominate this case as the worst misapplication of the law relating to termination of parental rights that has emanated from this court.

The case involves two very immature teen-agers who had a child out of wedlock. When the mother, Veronica, was a high-school senior, she became pregnant. She had told her boyfriend, Shawn Whitney, on a number of previous occasions, that she believed herself to be pregnant. These statements turned out to be false, and Shawn had no reason to believe that she was telling the truth when she finally did become pregnant in October of 1995. As late as January 25, 1996, Shawn's mother, Linda, according to the majority opinion, "maintained that 'she still felt [the pregnancy] was a hoax.' " Nonetheless, a baby girl was born on May 29, 1996.

On June 25, 1996, one Teresa Pinney, who had talked Veronica into giving her baby away to her, filed a petition to terminate Shawn's rights as father of the baby.[1] Ultimately Shawn's paternity was established by DNA testing, and it would appear that after Shawn became satisfied that he was in fact the father, he acted diligently to protect his legal rights as a father. He vigorously contested Ms. Pinney's attempts to take his daughter away from him and, on August 28, 1996, traveled three thousand miles to appear in court to contest Ms. Pinney's attempts to take his child away from him. Then again, on February 12, 1997, Shawn traveled from New Jersey to Las Vegas to appear in an evidentiary hearing in opposition to Ms.Pinney's petition to terminate his parental rights. In addition to this, on August 30, 1996, Shawn filed his own "Motion for Custody or in the Alternative for Visitation." Shawn completed a baby care class and purchased clothing and furniture for the child. It is hard to imagine a father who was more interested in maintaining his parental ties than Shawn was.

The majority opinion focuses on Shawn's conduct and attitude

---

[1]Shawn has not raised the question of respondent Pinney's standing to file a termination proceeding less than one month after the baby was born and before any adoption proceeding had been instituted. I cannot imagine what interest Pinney had at that time in terminating Shawn's rights to the baby. This point is not raised by the appellant; so I will not discuss it further.

during Veronica's pregnancy, faulting Shawn for not being more attentive to his girlfriend during her pregnancy. In this case, it does not really make much of a difference whether the trial court did or did not take into consideration Shawn's pre-birth attitude toward Veronica's claimed pregnancy because, overall, it is very clear that Shawn did everything possible to protect his parental rights, once he realized that he was the father of this child. To argue, under the circumstances of this case, that Shawn "abandoned" his child (which is to say, under NRS 128.012(1) that he had a "settled purpose . . . to forego all parental custody and relinquish all claims to the child") is without any basis in fact. Shawn exhibited absolutely *no* intention at any time to give up his daughter. How the trial court and this court could possibly have concluded that Shawn abandoned his daughter and that this fact had been proven by clear and convincing evidence is extremely hard to understand.

The majority does not discuss the other, asserted jurisdictional grounds for termination (risk of injury to the child and "token" efforts by Shawn to be a parent); so I will not discuss them either, except to say that I have found no one who pretends to understand what the term "token efforts" might mean in the context of termination proceedings, and certainly there is nothing even close to a showing that this child would be in danger of "injury" if Shawn's parental rights were not permanently eradicated.

With regard to dispositional grounds, the majority merely concludes that the child's best interests would be served by permanently depriving Shawn of his parental rights. This, of course, is not sufficient to justify a termination of parental rights; and it is certainly not possible to say that "under no reasonable circumstances [may] the child's best interest be served by sustaining the parental tie" of the child's father. Champagne v. Welfare Division, 100 Nev. 640, 652, 691 P.2d 849, 858 (1984).

There is no just cause why Ms. Pinney should be permitted to get away with this legally-sanctioned abduction of Shawn's baby. I dissent.