IN THE MATTER OF THE PARENTAL RIGHTS AS TO Q.L.R., A MINOR.

ROGER D. R., APPELLANT, v. DINA L. M., RESPONDENT.

No. 38221

September 18, 2002

54 P.3d 56

[Rehearing denied October 31, 2002]

[En banc reconsideration denied December 31, 2002]

*Paul M. Gaudet,* Las Vegas, for Appellant.

*Jerome A. DePalma,* Las Vegas, for Respondent.

----

[21]*See* Cal. Veh. Code § 23153 (West 2000).

## OPINION

*Per Curiam:*

Appellant Roger D. R. challenges a district court order terminating his parental rights to his minor child, Q.L.R. This appeal presents an issue of first impression for this court: Does incarceration, as a matter of law, support a determination that a parent intended to abandon his or her minor child? Roger contends that the district court erred by finding that, as a result of his incarceration, he abandoned Q.L.R. and that termination of his parental rights was in the child's best interests. We agree and, therefore, reverse the district court's order terminating Roger's parental rights.

### FACTS

In 1997, the minor child, Q.L.R, was born to appellant Roger D. R. and his wife, respondent Dina L. M. Roger and Dina permanently separated in August 1999. During the parental rights

termination hearing in June 2001, Roger admitted that in the summer of 1999, he developed an addiction to crack/cocaine, had what he described as an "idiotic two months," and took a leave of absence from his job. He began calling Dina at work eighty to one hundred times per day. Dina, however, refused his calls, so Roger was unable to speak with her about Q.L.R.

Based on the numerous phone calls Roger placed to both Dina and her parents, Dina filed for a temporary protection order (TPO) against Roger, which a district court issued in September 1999. The TPO prohibited Roger from any contact with Dina or Q.L.R. and granted Dina temporary custody of the child. The TPO was still in effect in November 1999, when the following incident occurred.

The record shows that Roger approached Dina outside Q.L.R.'s daycare center. He forced his way into her car and drove around Las Vegas with Dina and Q.L.R. for approximately six hours. During this time, Roger did not physically harm Q.L.R. At one point, they went to a grocery store to buy diapers and food for Q.L.R., and again later stopped at Jack-in-the-Box to eat.

At approximately 2 p.m., Dina, who at that point was driving the car, dropped Roger off at a friend's house and called 911. As a result of this incident, Roger was imprisoned in November 1999. In April 2000, the district court convicted Roger of aggravated stalking, burglary, robbery, and second-degree kidnaping. He was sentenced to five to fifteen years in prison, with the sentences to run concurrently. Shortly thereafter, Dina petitioned the district court to terminate Roger's parental rights.

In addition to the facts described above, the following relevant evidence was also introduced during the parental rights termination hearing. Roger testified that he was "really happy" when Q.L.R. was born and that he read to her, sang to her, and played games with her. He testified that he loves Q.L.R. very much. Dina testified that Roger interacted affectionately with Q.L.R. prior to his incarceration. Dina further testified, however, that prior to her separation from Roger, Roger never picked up Q.L.R. at daycare. According to Dina, on four occasions when Q.L.R. was sick and had to receive medical attention in the middle of the night, Roger did not accompany Dina and Q.L.R. to the hospital. Dina also testified that when she left Roger, he withdrew all of the money from their checking and savings accounts, forcing her to declare bankruptcy.

Additionally, the record establishes that prior to August 1999, Roger lived with Dina and Q.L.R. and contributed to the family expenses. Between August 1999, when Roger and Dina separated, and June 2001, when the district court held the parental rights termination hearing, Roger gave Dina $50.00 for Q.L.R.'s care. From November 1999 until the parental rights termination hear-

ing, however, Roger was in prison, where he worked at a non-paying job and, therefore, was unable to provide financial support for Q.L.R. He did make Q.L.R. cards and drawings, which he attempted to send to her. He has also filed a civil lawsuit to regain possession of his personal property from Dina's father, so that he can sell it to provide money for Q.L.R.

At the time of this appeal, Roger remains in prison. The record shows that, while in prison, Roger has completed programs in addiction, commitment to change, stress management, conflicts and resolutions, vital issues, resumes and interviews, and athletics. At the time of the parental rights termination hearing, Roger was in the process of completing a structured living program, which is a boot camp, military-based program. He had also received a scholarship bond and was taking college courses through a University of Nevada at Reno correspondence program. Roger is eligible for parole in 2004.

## DISCUSSION

The bond between parent and child is a fundamental societal relationship.[1] Termination of the parent-child relationship implicates fundamental liberty interests that are protected by the United States Constitution.[2] This court will only uphold parental termination orders if they are supported by substantial evidence.[3] As this court has previously explained, termination of a parent's rights to his child is "tantamount to imposition of a civil death penalty."[4]

In order to terminate parental rights, a petitioner must prove by clear and convincing evidence that termination is in the best interests of the child and must also establish parental fault.[5] In its order terminating Roger's parental rights, the district court found that Roger's incarceration constituted abandonment of Q.L.R. The district court explained:

---

[1]*See Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *see also Stanley v. Illinois*, 405 U.S. 645, 651 (1972).

[2]*See Santosky*, 455 U.S. at 753.

[3]*Matter of Parental Rights as to Carron*, 114 Nev. 370, 374, 956 P.2d 785, 787 (1998), *overruled on other grounds by Matter of Parental Rights as to N.J.*, 116 Nev. 790, 8 P.3d 126 (2000).

[4]*Drury v. Lang*, 105 Nev. 430, 433, 776 P.2d 843, 845 (1989).

[5]NRS 128.105. The district court in this case erred when, in explaining its decision to the parties, it stated that it must first find parental fault and then analyze the best interests of the child. That is not the law in the State of Nevada. *See Matter of N.J.*, 116 Nev. at 790, 8 P.3d at 126.

> Due to [Roger's] conduct . . . , he has not provided for the care, support and nurturing of the minor child since August, 1999. Also, [Roger's] voluntary conduct . . . has hampered and impeded continual contact and relationships with the minor child, so that little or no contact has occurred between the minor child and [Roger]. [Roger's] incarceration . . . is as a result of his own conduct.

The district court apparently relied on the rationale that by committing a crime, Roger intended to go to prison and, therefore, to abandon Q.L.R. We simply cannot agree with the district court's reasoning.[6]

The Nevada Legislature has not provided that incarceration constitutes abandonment as a matter of law. NRS 128.012 defines "abandonment of a child" and prescribes the circumstances in which abandonment may be presumed:

> 1. "Abandonment of a child" means any conduct of one or both parents of a child which evinces a settled purpose on the part of one or both parents to forego all parental custody and relinquish all claims to the child.
> 2. If a parent or parents of a child leave the child in the care and custody of another without provision for his support and without communication for a period of 6 months, . . . the parent or parents are presumed to have intended to abandon the child.

This court has held that "[i]ntent is the decisive factor in abandonment and may be shown by the facts and circumstances."[7] Consistent with the statute and our prior decisions regarding abandonment, we hold that voluntary conduct resulting in incarceration does not alone establish an intent to abandon a minor child.[8] For the following reasons, we conclude that substantial evi-

---

[6]*Cf. Staat v. Hennepin County Welfare Board,* 178 N.W.2d 709, 713 (Minn. 1970) ("Thus, since an intention to forsake the duties of parenthood must be present before abandonment can be found, it necessarily follows that a separation of child and parent due to misfortune and misconduct alone, such as incarceration of the parent, does not constitute intentional abandonment.").

[7]*Matter of Parental Rights of Montgomery,* 112 Nev. 719, 727, 917 P.2d 949, 955 (1996), *superseded by statute on other grounds as stated in Matter of Parental Rights as to N.J.,* 116 Nev. 790, 8 P.3d 126 (2000).

[8]*Cf. Crawford v. Arkansas Dept. of Human Serv.,* 951 S.W.2d 310, 313 (Ark. 1997) ("Although imprisonment imposes an unusual impediment to a normal parental relationship, we have held that it is not conclusive on the termination issue."); *Diernfeld v. People,* 323 P.2d 628, 631 (Colo. 1958) ("We cannot hold that every convicted felon, by that fact alone, loses all parental rights in children. . . . It is not one of the punishments prescribed by law that conviction of a felony works also for forfeiture of parental rights."), *cited in*

dence did not exist to support a finding of abandonment in this case.

The facts and circumstances in this case do not satisfy either NRS 128.012(1) or NRS 128.012(2). Roger's conduct did not demonstrate a settled purpose to relinquish all claims to Q.L.R. The record in this case shows that although Roger has been unable to provide consistent financial support while in prison, he has attempted to continue his relationship with Q.L.R.[9] He was able to send a small amount of money for Q.L.R.'s financial support after his father sold some of his personal possessions. Roger also filed a civil lawsuit to reclaim more of his personal possessions from Dina's father, so that he can sell the items to provide more money for Q.L.R. Additionally, Roger attempted to send Q.L.R. cards and drawings he made for her while in prison, which Dina admittedly refused to give to Q.L.R. Based on Roger's attempts to maintain contact with and to provide support for Q.L.R. while in prison, we conclude that the record does not contain substantial evidence to support a finding of abandonment.

Substantial evidence also does not support the district court's finding that it is in Q.L.R.'s best interests to terminate her father's parental rights. In analyzing the best interests of the child, the district court should look to the factors outlined in NRS 128.005(2)(c) and consider each matter on a case-by-case basis. Under that statute, the "decisive considerations in proceedings for termination of parental rights" are the "continuing needs of a child for proper physical, mental and emotional growth and development."[10]

In its best interests analysis, however, the district court focused on the length of Roger's incarceration as the decisive factor to support termination of his parental rights. The district court stated in its order that "any attempted re-establishment of a relationship that far in the future will not be in the child's best interest."

---

*Petition of R.H.N.,* 710 P.2d 482, 487 n.4 (Colo. 1985); *In Interest of B.W.,* 498 So. 2d 946, 948 (Fla. 1986) ("Incarceration does not, as a matter of law, constitute abandonment.").

[9]*Cf. In re J.D.C.,* 819 So. 2d 264, 267 (Fla. Dist. Ct. App. 2002) (holding that a finding of abandonment was improper where father "maintained communication with the child through the grandmother," even though he was "unable to provide emotional or financial support while incarcerated"); *Staat,* 178 N.W.2d at 713 ("[I]f a parental relationship existed prior to a father's imprisonment and he continued this relationship *to the best of his ability during incarceration* through letters, cards, and visits where possible . . . his parental rights would be preserved." (emphasis added)).

[10]NRS 128.005(2)(c).

Nevada's statutory scheme does not support termination based solely on the duration of incarceration.[11] To do so would deprive a parent of his or her parental rights without adequate consideration of the child's best interests and the existence of parental fault, which factors the State of Nevada has deemed fundamental to its statutory scheme.[12]

Roger is eligible for parole in 2004, when Q.L.R. will be seven. Nothing in the record supports a finding that Q.L.R. could not form a loving and supportive relationship with her father in the future. While in prison, he has completed a number of programs that should assist him in becoming a positive part of Q.L.R.'s life upon his release. The record shows that prior to August 1999, Roger contributed to the family expenses. During the parental rights termination hearing, Dina testified that when she saw Roger interact with Q.L.R., he interacted affectionately with her. At the time of this appeal, Q.L.R. lived with her mother, who had not remarried, and there was no one seeking to adopt Q.L.R. This case, therefore, is unlike those cases where a step-parent wants to adopt the child of an incarcerated parent or the child is placed in foster care and has formed other bonds.[13] This case does not warrant "imposition of a civil death penalty."[14]

---

[11]*See* NRS 128.106(6). This NRS statutory provision, entitled "**Specific considerations in determining neglect by or unfitness of parent**," is the only parental rights termination provision that directly addresses incarceration. It addresses the nature of the crime, not the duration of incarceration. *Compare id.* ("Conviction of the parent for commission of a felony, *if the facts of the crime are of such a nature as to indicate the unfitness of the parent* to provide adequate care and control to the extent necessary for the child's physical, mental or emotional health and development." (emphasis added)), *with* Fla. Stat. Ann. § 39.806(1)(d)(1) (West Supp. 2002) ("'(1) [A]ny person who has knowledge of the facts alleged or who is informed of those facts and believes that they are true may petition for the termination of parental rights under any of the following circumstances: . . . . (d) When the parent of a child is incarcerated in a state or federal correctional institution and . . . 1. The period of time for which the parent is expected to be incarcerated will constitute a substantial portion of the period of time before the child will attain the age of 18 years . . . .'").

[12]*Cf. Stanley,* 405 U.S. at 651, 653. We do not intend, however, for this opinion to be interpreted as holding that the *nature* of the crime for which a parent is convicted is not a relevant factor in determining the child's best interests. Here, however, the district court found that Roger's criminal conduct was not directed at Q.L.R., nor does the record show that Q.L.R.'s physical, mental and emotional growth and development would be threatened by continued interaction with her father. *Compare Crawford,* 951 S.W.2d at 311, 313 (parental rights of incarcerated parent terminated where parent convicted of violation of a minor in the first degree).

[13]*Cf. Bush v. State, Dep't Hum. Res.,* 112 Nev. 1298, 1303, 929 P.2d 940, 944 (1996) (concluding that there was clear and convincing evidence that "the best interests of the children would be served by termination of the parental rights" of the incarcerated parent, where the children spent four years in a foster home and the foster parents were willing to adopt them).

[14]*Drury,* 105 Nev. at 433, 776 P.2d at 845.

Because the district court's findings were not supported by substantial evidence, we reverse its order terminating Roger's parental rights.

## ORDER DENYING REHEARING*

Respondent has petitioned this court for rehearing of the opinion issued September 18, 2002. We note that this court did not misapprehend the record. Rather, as the district court's decision was based primarily upon the fact of incarceration, without consideration of other issues, this court could not consider other bases for termination. Nothing in our opinion is intended to prevent consideration of termination on other grounds. Accordingly, we deny rehearing. NRAP 40(c).

Dated this 31st day of October, 2002.

---

*\*Editor's Note:* By order entered on December 31, 2002, the en banc court directed the clerk of this court to publish the panel's order denying rehearing.