OPINION

Per Curiam:

Appellant Richard contends that the district court erred in terminating his parental rights because there was no clear and con *739 vincing evidence that termination would serve his children’s best interests or that there was parental fault. We disagree. The record includes substantial evidence that termination is in the children’s best interests, and Richard failed to overcome the statutory presumption that his children’s best interests would be served by termination. Additionally, unlike our recent cases, Matter of Parental Rights as to Q.L.R.[1] and Matter of Parental Rights as to J.L.N.,[2] the district court did not rely solely upon Richard’s incarceration in determining parental fault. We therefore affirm the judgment of the district court terminating Richard’s parental rights.

FACTS

K.D.L. was born to Mary and Richard on October 14, 1996. S.P.K. was born to Mary and Richard on January 1, 1998. Mary and Richard were never married; however, there is no dispute that Richard is the father of both children.
On August 28, 1998, Las Vegas Metropolitan Police Department (LVMPD) officers were dispatched to the University Medical Center in reference to a domestic violence call. Hospital personnel had contacted the police due to injuries sustained by Mary, who had multiple contusions and bruises all over her body, including a two-inch gash on the top of her head. Mary, who arrived at the emergency room with her then eight-month-old child, S.P.K., reported to medical personnel that she had been beaten six days prior by her boyfriend of five years, Richard. Mary stated that K.D.L., nearly two years old at the time, had witnessed the attack.
Despite being diagnosed with a bi-lateral jaw fracture requiring surgery, Mary declined to press charges and stated she would return to the parties’ shared home. Mary also indicated that the parties’ child, K.D.L., was with Richard at that time. Based on Mary’s intent to return to the parties’ home, the severity of Mary’s injuries, the fact that K.D.L. allegedly witnessed the attack on Mary, and the potential for harm to the children if Richard attacked Mary again, LVMPD decided to take the children into protective custody.
A subsequent investigation by the Nevada Division of Child and Family Services (DCFS) revealed that in addition to the issues involving domestic violence, both Mary and Richard admitted to substance abuse and Richard tested positive for cocaine and marijuana. In addition, Richard also had previous misdemeanor convictions for offenses related to substance abuse and domestic violence dating back to 1994. Richard also had prior arrests for willfully aiming a firearm and driving under the influence. DCFS *740 reported that two-year-old K.D.L. had started imitating Richard’s battering behaviors and that Richard had appeared at Child Haven to visit his children smelling of alcohol and acting in a confrontational manner towards Child Haven staff members. Charges of abuse and neglect were sustained against Mary and Richard, and the children were made wards of the State. A case plan for reunification was developed.
The case plan required Richard to: (1) attend weekly anger management therapy sessions, (2) take and continue to take psychotropic medication, (3) attend parenting classes, (4) submit to random urinalysis, and (5) obtain a drug and alcohol assessment from a Bureau of Alcohol and Drug Abuse (BADA) certified counselor and follow any recommendations made by that counselor.
On May 2, 1999, approximately six months later, Richard was again arrested. He was charged with resisting a peace officer, unlawful use/possession of drug paraphernalia, possession of a controlled substance, and carrying a concealed weapon. The record does not reflect the disposition on these charges.
On May 7, 1999, in its periodic review to the district court, DCFS indicated that, as required by the case plan, Richard had followed through with assessment and treatment by a psychiatrist, was taking medication as prescribed by the psychiatrist on a regular basis, had completed all but one parenting class through DCFS, and was attending counseling with Mary. The case specialist reported that Richard and Mary had made significant progress in the counseling process. Richard had not, however, submitted proof of assessment from a BADA certified drug and alcohol program as required by the case plan. The May 1999 arrests were not discussed.
DCFS reported that the children had been placed in foster care and had received physical, emotional, and educational evaluations. The report indicated that S.RK. was too young to evaluate for educational delays, but K.D.L. evinced a combination of expressive and receptive language/speech delays, as well as fine and gross motor skill delays. The report stated that both children had responded favorably to the care and direction provided by the foster parents in conjunction with services provided by Early Childhood Services. At the time of the report, case specialist Terry Lowery indicated that reunification of the family was a goal of the case plan.
A Court Appointed Special Advocate (CASA), Pamela McGaha, submitted her evaluation of K.D.L. and S.P.K. on May 7, 1999, as well. McGaha expressed concern that Richard had difficulty adhering to the visitation rules mandated by DCFS. She also expressed concern about Richard’s apparent lack of control. *741 Following review of the submitted evaluations, however, the district court, based on the partial completion of the case plan, ordered the children returned to the care of Mary and Richard.[3]
On July 28, 1999, Richard pleaded guilty to battery with substantial bodily harm arising out of the August 1998 incident involving Mary. Richard’s sentence for this offense was suspended and he was placed on probation.[4] However, at some point between June 1999 and September 1999, Richard committed an act of battery/domestic violence against his mother, thus violating the terms of his probation agreement.[5] Because of the new arrest, and Mary’s inability to adequately care for K.D.L. and S.P.K., the children were again placed in foster care.
On September 30, 1999, as a result of the second arrest for domestic violence, Richard’s probation was revoked by the district court. On December 14, 1999, Richard pleaded guilty to battery with a deadly weapon arising out of the incident involving his mother. Richard was sentenced to a maximum of one hundred twenty months with minimum parole eligibility in forty-eight months. The court ordered the sentence to run concurrently with the battery with substantial bodily harm conviction stemming from the August 1998 crimes against Mary. As of the time of the termination proceedings, Richard’s projected discharge date was April 2006. The earliest projected date at which Richard could petition for parole was March 2004.
On November 4, 1999, DCFS provided the court with a report for permanency review. On November 9, 1999, the district court concluded that reasonable efforts had been made to return K.D.L. and S.P.K. to the parental home, but that returning the children to the parental home would be contrary to their welfare. The district court further concluded that: (1) K.D.L. and S.P.K. should remain wards of the State, (2) Mary should be given primary physical custody of the children, (3) Richard should satisfy his child support arrearages, and (4) Mary should work closely with Child Find and DCFS in complying with all case plan recommendations. At DCFS’s request, a no contact order was issued on November 22, 1999, prohibiting Richard from having contact with his children based upon the trauma the children would sustain from contact visits while Richard was imprisoned.
*742 On March 14, 2000, K.D.L. and S.P.K. were again removed from Mary’s care based on reports that she was engaged in drug trafficking. Given both parents’ failure to adjust, DCFS began taking steps to terminate Mary’s and Richard’s parental rights. Additional hearings were held on a variety of motions regarding child support and visitation. Meanwhile, DCFS continued to try to work with Mary.
On April 27, 2001, DCFS filed a petition to terminate Mary’s and Richard’s parental rights. On September 10 and 13, 2001, the district court heard testimony and reviewed evidence regarding the petition. Mary did not appear to contest the termination of her parental rights. Richard appeared with counsel in the custody of prison authorities and testified in opposition to the petition to terminate his parental rights.
Richard testified that he did not know that the children had been removed from Mary’s care after he was sent to prison. He believed Mary was supporting herself from income she received from his rental properties. However, he did indicate that he never contacted anyone to check on the status of his children for approximately seven months and just assumed that Mary was taking care of them. Richard also stated that he was willing to commit his financial resources to the care and upbringing of his children until the date of his release.
In addition, Richard testified that he had no disciplinary actions while incarcerated. Richard also testified that he attended every class the prison offered in anger management, domestic violence, Alcoholics Anonymous, Narcotics Anonymous, and health-related issues. Richard stated that he took these classes in an effort to better himself and to become a better parent. Richard testified that he had sent over 200 letters and cards to his children, which had been returned to him on DCFS’s orders. As to the care of his children, Richard argued that he became angry with Mary because she did not properly supervise the children and they were hurt on numerous occasions as a result of her failure to properly watch them. Richard testified that he always made sure that the children had the best food and health care and that he only “lost it” when it became apparent to him that Mary was abusive towards the children.
Richard also contended that he was wrongfully convicted of the charges of battery with substantial bodily harm and battery with a deadly weapon and that he only pleaded guilty out of convenience and a desire to get things done quickly so he could be reunited with his children. As a result of the length of his prison sentence, he now realized he would not soon be reunited, so he was in the process of challenging his pleas. Finally, evidence was introduced indicating that Richard had been arraigned on federal weapons and attempted arson charges stemming from activities *743 taking place in 1996. Richard indicated that he would be going to trial at a future date on these charges.
On October 3, 2001, the district court issued a written order terminating the parental rights of Mary and Richard. In terminating Richard’s parental rights, the district court concluded that parental unfitness and failure of parental adjustment were proven by clear and convincing evidence. The district court found Richard unfit pursuant to NRS 128.106(6), based upon his convictions for domestic violence and the possibility that his children might become victims of his violent outbursts. Specifically, the district court noted that Richard’s violent outbursts were not limited to Mary but were also taken against his mother. The district court found that there was a significant risk that Richard’s professed love of his children would not protect them from harm during one of his violent outbreaks. The district court also found that Richard had not rebutted the presumption of NRS 128.109(l)(b),[6] regarding failure of parental adjustment. The district court considered the length of Richard’s incarceration and the need for extensive supervision even once he was released in applying the presumption. However, the key factor in the district court’s finding of failure of parental adjustment was Richard’s conduct when not incarcerated and the nature of his crimes. The district court stated:
More importantly, however, while in society and even after the children were initially removed, [Richard] did not change his violent behavior. It is not enough to comply with a case plan if the lessons the case plan seeks to address are not learned. [Richard] made efforts under the initial case plan but did not learn the lessons of nonviolence. The [DCFS] made reasonable efforts but [Richard’s] violence continued.
Regarding the best interests of the children, the district court concluded that Richard, while objecting to the termination of his parental rights, had failed to overcome the presumption in favor of termination of his parental rights as enunciated in NRS 128.109(2).[7] The district court noted that, at the earliest, Richard *744 would not be eligible for parole for another seventeen months and there would be a lengthy period of counseling and readjustment before any thought to reunification could be given. K.D.L. and S.P.K. were toddlers when their father went to prison, and they had not developed significant bonds with him prior to his incarceration. Moreover, the district court found that K.D.L. and S.P.K. had been in foster care for three years,[8] had resided with their current foster family since 2000, the foster family wished to adopt them together, K.D.L. and S.P.K. were well integrated into the foster family, and they would greatly benefit from permanent placement with the foster family.

DISCUSSION

“Termination of parental rights is ‘an exercise of awesome power.’ ’ ’[9] We have previously characterized the severance of the parent-child relationship as “ ‘tantamount to imposition of a civil death penalty.’ ”[10] To terminate a parent’s rights, a petitioner must prove, by clear and convincing evidence, that termination is in the child’s best interests and that there is parental fault.[11] We will uphold terminations based on substantial evidence.[12]
In determining whether to terminate parental rights, this court has stated that “in conformance with NRS 128.105, we adopt a best interests/parental fault standard.”[13] Although the best interests of the child and parental fault are distinct considerations, determining the best interests of the child necessarily includes considerations of parental fault, and both standards must be proven by clear and convincing evidence.[14] Thus, in addition to considering the child’s best interests, the district court must also *745 find at least one of the enumerated factors of parental fault: (1) abandonment of the child; (2) neglect of the child; (3) unfitness of the parent; (4) failure of parental adjustment; (5) risk of injury to the child if returned to, or left remaining in, the home of the parent; or (6) only token efforts by the parent.[15]

Best interests

NRS 128.109(2) states that, when a child has been placed outside his home pursuant to NRS chapter 432B, and “has resided outside of his home pursuant to that placement for 14 months of any 20 consecutive months, the best interests of the child must be presumed to be served by the termination of parental rights.” “Taken together, NRS 128.109(2) and NRS 432B.553(2) express the general public policy to seek permanent placement for children rather than have them remain in foster care.”[16]
In the present case, K.D.L. and S.RK. were made wards of the State and placed in foster care in November 1998. They were returned to their parents’ custody on May 21, 1999. Richard was incarcerated in August 1999 based upon his second conviction for domestic violence and for violation of his probation agreement’s terms. He has been in custody since that date. K.D.L. and S.P.K. were again removed from their mother’s custody and returned to foster care on March 14, 2000. Thus, in their third placement outside their parents’ home, K.D.L. and S.P.K. had resided for nineteen consecutive months in foster care.
We conclude that the district court did not err in finding that clear and convincing evidence demonstrated that K.D.L.’s and S.P.K.’s best interests would be served by termination of Richard’s parental rights. First, Richard failed to overcome the presumption enunciated in NRS 128.109(2). Second, as noted above, Richard’s felony convictions for domestic violence, coupled with the pending federal charges, operate to his detriment. The record contains substantial evidence of Richard’s inability to manage his anger, including his belligerence toward the district court during the termination hearing, his violent assaults against close family members, and his continued denial of the physical harm he caused.
Lastly, K.D.L. was three years old and S.P.K. only eighteen months old when Richard was incarcerated in November 1999. No strong or stable bond exists between these children and their father.[17] However, the district court properly concluded, under NRS 128.108, that the children had formed a well-integrated *746 family bond with a foster family who wished to adopt both children. We conclude the district court did not err in concluding that clear and convincing evidence existed to demonstrate K.D.L.’s and S.P.K.’s best interests would be served by the termination of Richard’s parental rights.

Parental fault

As noted above, NRS 128.105 sets forth the grounds for terminating parental rights, including considerations the district court may make regarding parental conduct. In the present case, the district court concluded that parental unfitness and failure of parental adjustment were proven by clear and convincing evidence.[18] We agree.

Parental unfitness

NRS 128.106(6) states that the court may consider, as evidence of unfitness of a parent, the “[cjonviction of the parent for commission of a felony, if the facts of the crime are of such a nature as to indicate the unfitness of the parent to provide adequate care- and control to the extent necessary for the child’s physical, mental or emotional health and development.” Moreover, it is “the nature of the crime for which a parent is convicted” that is the relevant factor when determining the best interests of the child.[19]
In the present case, Richard is currently serving sentences of imprisonment for two acts of domestic violence against close family members. The initial act of domestic violence against the children’s mother involved substantial bodily harm and resulted in the children’s removal from the parental home. Despite the institution of a case plan that specifically addressed Richard’s anger management issues, Richard committed a second act of domestic vio *747 lence with the use of a deadly weapon less than a year later against his own mother. Further, the record is replete with evidence suggesting that Richard has failed to learn to control his violent temper during the period of his incarceration. For example, during the hearing to terminate his parental rights, Richard maintained an aggressive posture towards both the court and his own counsel. Additionally, Richard’s own testimony indicates that he has failed to accept any responsibility for his crimes; he chose, for example, to blame K.D.L. for the second act of domestic violence against his mother.
Therefore, we conclude that clear and convincing evidence supports the district court’s finding of parental unfitness. The violent nature of Richard’s crimes indicates that he is unable to provide for K.D.L.’s and S.P.K.’s physical, mental, and emotional health and development.[20] However, even if the district court erred in its finding of unfitness, we note that clear and convincing evidence was presented below to demonstrate that returning the children to Richard’s care presented a serious risk of physical, mental, or emotional injury to the children pursuant to NRS 128.105(2)(e).

Failure of parental adjustment

The district court concluded that clear and convincing evidence of a failure of parental adjustment existed since Richard would not be eligible for release until, at the earliest, March 2004, and his pre-incarceration conduct indicated a failure of adjustment. Although the district court discussed Richard’s inability to comply with a case plan in a reasonable time period under NRS 128.109(l)(b), it did not rely solely on the fact of Richard’s incarceration in applying the presumption. Rather, the district court concluded that a failure of parental adjustment occurred where, in the intervening period between Richard’s initial arrest for domestic violence and the children’s removal from the parental home, Richard had failed to change his violent behavior and there was no indication he would correct his behavior within a reasonable period of time.[21] The district court found that the State had made *748 reasonable efforts to return K.D.L. and S.P.K. to their parental home. We agree.
Regarding the presumption for finding a failure of parental adjustment, this court has stated:
[W]e have previously stated that “[t]he parent . . . must be shown to be at fault in some manner . . . [and] cannot be judged unsuitable by reason of failure to comply with requirements and plans that are . . . impossible ... to abide by.”
Moreover, we have recognized that failure of parental adjustment as a basis for termination is “ ‘fraught with difficulties and must be applied with caution.’ ’ ’ The main concern in cases where parental adjustment is at issue is to provide some permanency for a child.[22]
Moreover, we have concluded that, when a district court considers a failure of adjustment and the presumptions enunciated in NRS 128.109(l)(b), incarceration of the parent, standing alone, is insufficient grounds to terminate parental rights.[23]
In the present case, Richard’s willingness to provide support for his children during the period of his incarceration and his desire to maintain contact with his children do not obviate the danger he presents to them by way of his violent criminal history. Despite adequate opportunity and the reasonable efforts of the DCFS, Richard committed a second act of violence within twelve months of his initial offense, thus wholly failing to address the requirements enunciated in the DCFS case plan. The period of Richard’s incarceration was not the sole factor supporting the district court’s decision. Rather, it is the nature of his offenses and the potential danger he presents to his children that is relevant.[24] Therefore, we conclude that the district court did not err in concluding that Richard demonstrated a failure of parental adjustment.
Accordingly, we affirm the judgment of the district court terminating Richard’s parental rights.

 118 Nev. 602, 54 P.3d 56 (2002).

 118 Nev. 621, 55 P.3d 955 (2002).

The district judge who returned the children to Mary and Richard was not the same district judge who presided over the termination proceedings.

The district court sentenced Richard to a minimum of twenty-four months to a maximum of eighty months, suspended, with probation not to exceed five years.

Richard was also arrested for a second act of battery/domestic violence against Mary on August 18, 1999. However, this charge was later withdrawn by the district attorney’s office.

NRS 128.109(l)(b) states:
If the parent or parents fail to comply substantially with the terms and conditions of a plan to reunite the family within 6 months after the date on which the child was placed or the plan was commenced, whichever occurs later, that failure to comply is evidence of failure of parental adjustment as set forth in paragraph (d) of subsection 2 of NRS 128.105.

NRS 128.109(2) states:
If a child has been placed outside of his home pursuant to chapter 432B of NRS and has resided outside of his home pursuant to that placement for 14 months of any 20 consecutive months, the best *744 interests of the child must be presumed to be served by the termination of parental rights.

At the time of Richard’s incarceration in August 1999, K.D.L. was nearly three years old and S.P.K. was eighteen months old. At the time of the district court’s decision, K.D.L. was five years old and S.P.K. was three years old.

Matter of Parental Rights as to N.J., 116 Nev. 790, 795, 8 P.3d 126, 129 (2000) (quoting Smith v. Smith, 102 Nev. 263, 266, 720 P.2d 1219, 1220 (1986), overruled on other grounds by Matter of N.J., 116 Nev. 790, 8 P.3d 126).

Id. (quoting Drury v. Lang, 105 Nev. 430, 433, 776 P.2d 843, 845 (1989)).

Id. at 801, 8 P.3d at 133; see NRS 128.105.

Matter of N.J., 116 Nev. at 795, 8 P.3d at 129 (quoting Kobinski v. State, 103 Nev. 293, 296, 738 P.2d 895, 897 (1987)).

Id. at 800, 8 P.3d at 132.

Id. at 801, 8 P.3d at 133.

Id.; see also NRS 128.105(2)(a)-(f).

Matter of J.L.N., 118 Nev. at 625, 55 P.3d at 958.

See Matter of Parental Rights as to C.J.M., 118 Nev. 724, 736, 58 P.3d 188, 194-96 (2002). This case involved the termination of an incarcerated *746 father’s parental rights based upon abandonment and unfitness. In affirming the termination of the father’s parental rights, this court noted that the district court’s finding of unfitness was based in part on the father’s conviction for a violent felony, as well as the father’s lack of a significant relationship with his children before his incarceration.

In its order, the district court also concluded that clear and convincing evidence existed to show Richard had made only token efforts to reconcile with his children. Because NRS 128.105(2)(a)-(f) requires demonstration of only one factor, and because we conclude that the district court did not err with respect to its findings of parental unfitness and failure of parental adjustment, we do not address this particular issue.

Matter of Q.L.R., 118 Nev. at 608 n.12, 54 P.3d at 59 n.12 (concluding that the district court erred in finding that the duration of a parent’s incarceration would support the termination of parental rights standing alone and noting that, in this case, the parent’s criminal conduct was not directed at the child, nor did it impact his physical, mental or emotional growth and development); see also Matter of J.L.N., 118 Nev. at 628, 55 P.3d at 960.

Cf. Matter of J.L.N., 118 Nev. at 628, 55 P.3d at 960-61 (reversing the termination of an incarcerated mother’s parental rights, and noting that the mother’s convictions did not involve conduct related to the abuse or neglect of her children).

See NRS 128.0126 (“ ‘Failure of parental adjustment’ occurs when a parent or parents are unable or unwilling within a reasonable time to correct substantially the circumstances, conduct or conditions which led to the placement of their child outside of their home, notwithstanding reasonable and appropriate efforts made by the state or a private person or agency to return the child to his home.”).

Matter of J.L.N., 118 Nev. at 627, 55 P.3d at 959 (footnotes omitted) (quoting Champagne v. Welfare Division, 100 Nev. 640, 652, 691 P.2d 849, 857 (1994), overruled on other grounds by Matter of N.J., 116 Nev. 790, 8 P.3d 126, and quoting Matter of Parental Rights of Montgomery, 112 Nev. 719, 729, 917 P.2d 949, 956 (1996) (quoting Champagne, 100 Nev. at 652, 691 P.2d at 857), superseded by statute on other grounds as recognized by Matter of N.J., 116 Nev. 790, 8 P.3d 126).

See id. at 627-28, 55 P.3d at 959-60.

Id. at 628, 55 P.3d at 960.