*623
 
 OPINION
 

 Per Curiam:
 

 Appellant Diana N. contends that the district court erred in terminating her parental rights when there was no clear and convincing evidence that termination would serve her child’s best interests or that there was parental fault. We agree. The record does not include substantial evidence that termination is in the child’s best interests, and Diana overcame the statutory presumption that her child’s best interests would be served by termination. Additionally, a failure to totally complete a case plan within the statutory time period of six months solely because of incarceration is not a ground for a finding of failure of parental adjustment or parental fault.
 

 FACTS
 

 In 1997, while working together in Wisconsin, Diana N. and Larry P. became involved in a romantic relationship. At the time, Diana was a single parent to a seven-year-old child, J.L.N., and was on probation for a 1992 conviction for issuing worthless checks and forgery. The couple lived together in Wisconsin for approximately one year. Though the relationship began to sour when Diana was about six months pregnant, the couple remained together and on June 29, 1998, their child C.E.P. was born. Diana claims that she remained with Larry despite domestic problems because she wanted the children to have a family. In late October or early November 1998, the couple traveled to Las Vegas to visit Larry’s parents. Larry wanted to move to Las Vegas, but Diana testified that she traveled there intending only to visit.
 

 On December 2, 1998, after Larry reported Diana to authorities, she was arrested at his parents’ home. Diana was told she was being picked up on a warrant from her probation officer because she had left Wisconsin without his permission. She informed the police that Larry was not the children’s legal father and that she did not want them to remain with him or his family — thus, the children were taken into custody as well. Diana claims that she expressly made this request because, given her prior experience with Larry, she knew he was incapable of caring for the children. Diana believed that the children would be kept in state custody until they could be returned to her family. However, after a hearing on December 3, 1998, the children were both released to Larry’s custody.
 

 C.E.P. subsequently incurred serious injuries which were suspected to have been caused by child abuse. As a result, on
 
 *624
 
 May 12, 1999, the children were made wards of the state and placed in a foster home. Larry pleaded guilty to one count of physical abuse and improper supervision. Larry later submitted to DNA testing, the results of which indicated that he is C.E.P.’s biological father.
 

 On August 31, 2000, the Division of Child and Family Services (DCFS) filed a petition to terminate Larry’s rights as to C.E.P. and Diana’s rights as to both children.
 
 [1]
 
 The petition alleged that the children were neglected and had been abandoned, and that the parents were unfit, had failed to adjust, and had made only token efforts to be reunited with the children. Since her arrest, Diana had been incarcerated in Wisconsin and her mother’s efforts to obtain custody of her children and return them to that state had been denied.
 

 DCFS acknowledged that J.L.N. had a strong bond with Diana and wanted to reunite with Diana and her family in Wisconsin. However, J.L.N. also expressed frustration with her life, indicating that she preferred to be adopted rather than wait another year for her mother’s release from prison.
 
 [2]
 
 DCFS also recognized that Diana had completed her case plan to the extent possible, given her incarceration, and that the plan itself was designed to be completed three to six months after Diana’s release from prison. Additionally, DCFS personnel acknowledged that both Diana and the maternal grandmother had maintained constant contact with their office and with J.L.N. The DCFS supervisor in charge of this case testified that it was an “unfortunate situation” but that her office was statutorily bound to initiate the petition given the amount of time J.L.N. had been a ward of the state.
 

 Finally, the DCFS supervisor testified that she would have preferred to wait until, at least, the next parole board hearing before pursuing termination of Diana’s parental rights. Because of J.L.N.’s age and her bond with Diana, the supervisor was concerned with the impact the termination would have on J.L.N. when she became a teenager. DCFS presented no additional evidence in support of the “best interest” prong of the petition. Thus, the petition was based entirely on the general theory that the length of Diana’s incarceration was too long to wait for a permanent placement.
 

 After a hearing on April 20, 2001, the petition to terminate Diana’s parental rights was granted. The district court found that termination of Diana’s parental rights was in J.L.N.’s best interests and that Diana was “an unsuitable parent based upon failure of parental adjustment.”
 

 
 *625
 

 DISCUSSION
 

 “[T]he parent-child relationship is a fundamental liberty interest”
 
 [3]
 
 and the Due Process Clause of the Fourteenth Amendment
 
 [4]
 
 protects parents’ fundamental right to care for and control their children.
 
 [5]
 
 Statutes that infringe upon this interest are thus subject to strict scrutiny and must be narrowly tailored to serve a compelling interest.
 
 [6]
 

 “Termination of parental rights is ‘an exercise of awesome power.’ ’ ’
 
 [7]
 
 We have previously characterized the severance of the parent-child relationship as ‘ ‘ ‘tantamount to imposition of a civil death penalty.’ ”
 
 [8]
 
 To terminate a parent’s rights, a petitioner must prove, by clear and convincing evidence, that termination is in the child’s best interests and that there is parental fault.
 
 [9]
 
 We will uphold terminations based on substantial evidence.
 
 [10]
 

 The district court ruled that the best interests of the child prong was satisfied by applying a presumption based on the length of time J.L.N. had been placed outside of Diana’s home.
 
 [11]
 
 Little other evidence was presented to support a finding that termination was in J.L.N.’s best interests.
 

 Taken together, NRS 128.109(2) and NRS 432B.553(2) express the general public policy to seek permanent placement for children rather than have them remain in foster care. Under the statutes, the best interests of the child must be presumed to be served by termination of parental rights if the child has been
 
 *626
 
 placed outside the home for fourteen of any twenty consecutive months. These are, however, rebuttable presumptions. NRS 432B.553(2)(c) specifically permits DCFS to forego pursuing termination of parental rights when it finds compelling reasons that termination would not be in a child’s best interest. We conclude that Diana presented substantial evidence to overcome the presumptions. Compelling reasons demonstrate why termination of parental rights was not in J.L.N.’s best interests.
 

 First, the record establishes that Diana and J.L.N. have a strong, loving bond and that the child wants to be reunited with Diana. J.L.N. also has a firmly established, loving relationship with the maternal grandparent and has expressed a desire to continue this relationship. Though J.L.N. had spent time playing with the children in the prospective adoptive home, and admittedly had a positive relationship with the family, J.L.N. has never lived in that home. Even if parole were denied, Diana’s incarceration would end no later than March 2002. Diana’s felony conviction did not involve conduct related to the abuse or neglect of her children. While J.L.N. was in the care of Larry, Diana and her mother were actively pursuing guardianship proceedings to place the children in a more suitable environment. There is no evidence Diana suffers from alcohol or other substance abuse problems.
 

 While J.L.N. did express concern over waiting another year for reunification, there is no evidence to suggest that this anxiety was jeopardizing J.L.N.’s health or well being. Taken together with the testimony regarding the potential effects of termination upon J.L.N. when she becomes a teenager, we conclude that the positive experiences J.L.N. had as a guest in the prospective adoptive home, and the likelihood that she might have a permanent home with that family, together with her general wish for permanency, do not constitute substantial evidence supporting the district court’s conclusion that termination was in J.L.N.’s best interests.
 

 The district court also found that DCFS had proven, by clear and convincing evidence, failure of parental adjustment.
 
 [12]
 
 Diana contends that the district court abused its discretion in concluding that her failure to complete the case plan constituted a failure to adjust, warranting termination of her parental rights. DCFS conceded that Diana complied with as much of the plan as possible and that the plan was impossible to complete while Diana remained incarcerated. We agree with Diana’s position.
 

 Under NRS 128.0126, when a parent is unable or unwilling to correct the circumstances, conduct or conditions that led to the placement of a child outside the home, there is a failure to adjust. NRS 128.109(l)(b) provides that if a parent fails to comply substantially with the case plan within six months after its inception,
 
 *627
 
 there is a presumption that the parent has failed to adjust. However, we have previously stated that “[t]he parent . . . must be shown to be at fault in some manner . . . [and] cannot be judged unsuitable by reason of failure to comply with requirements and plans that are . . . impossible ... to abide by.”
 
 [13]
 

 Moreover, we have recognized that failure of parental adjustment as a basis for termination is “ ‘fraught with difficulties and must be applied with caution.’”
 
 [14]
 
 The main concern in cases where parental adjustment is at issue is to provide some permanency for a child.
 
 [15]
 

 We now address the issue of how a parent’s incarceration relates to parental adjustment and the decision to terminate parental rights. The majority of other jurisdictions that have considered this issue have concluded that termination should not be granted based on the parent’s incarceration alone.
 
 [16]
 
 These jurisdictions have determined that the parent’s incarceration is relevant, but that other factors must also be considered.
 
 [17]
 

 
 *628
 
 Similarly, we conclude that while a parent’s incarceration must be considered in determining whether termination is proper, incarceration alone is insufficient to satisfy the statutory requirement of parental fault as it relates to failure of parental adjustment. When considering a parent’s incarceration in termination proceedings, the district court must consider the nature of the crime, the sentence imposed, who the crime was committed upon, the parent’s conduct toward the child before and during incarceration, and the child’s specific needs. This approach allows for consideration of the family’s individual circumstances and, in our opinion, better accomplishes the legislature’s expressed desire to give primary consideration to the child’s best interests.
 
 [18]
 

 Additionally, the mere failure to complete a case plan within six months does not necessarily constitute a ground for finding parental fault. The presumption in NRS 128.109(l)(b)
 
 [19]
 
 may be rebutted by evidence that the parent has made reasonable and consistent efforts to adjust the circumstances that led to the children being placed outside of their home. The presumption triggered by the failure to complete a case plan is rebuttable, and in this particular case, was rebutted by evidence showing that Diana did as much as possible while incarcerated. The remainder of the plan could not be completed until her release, which was not so far in the future as to render her unable to complete the plan in a reasonable length of time. This conclusion is consistent with our prior holding that there be a finding of parental fault and not simply a failure to comply with objectives that are impossible to abide by.
 
 [20]
 

 In this case, the record establishes that termination resulted solely because Diana was incarcerated for more than fourteen months — thus triggering various presumptions, all of which accumulated against her. According to the testimony of the DCFS supervisor, the petition itself was filed merely because the requisite time frame provided in NRS 432B. 590(4) had elapsed. This passage of time also triggered the presumptions in NRS
 
 *629
 
 128.109(l)(a)
 
 [21]
 
 and (b)
 
 [22]
 
 and NRS 128.109(2), resulting in Diana’s rights being terminated, essentially for writing bad checks.
 

 DCFS acknowledged that it had “ethical” issues with pursuing a termination of Diana’s rights but was statutorily bound to do so under NRS 432B. 590(4). Indeed, DCFS vigorously pursued reunification because it believed it was in J.L.N.’s best interests. DCFS only sought termination based upon the passage of time and its inability to convince Wisconsin to permit J.L.N. to reside with her grandmother. Further, DCFS acknowledged that, despite their physical separation, Diana and her mother had made substantial efforts to maintain a relationship with J.L.N. Diana also made significant efforts to complete the case plan in order to be reunited with the child. Even so, parental fault was found solely based “on the passage of time,” and the obstacles the remaining prison sentence posed to reunification. The evidence clearly demonstrated that Diana was able to provide a stable home for J.L.N. for several years prior to her incarceration. We therefore conclude that the district court abused its discretion in finding that the parental fault prong was satisfied.
 

 Diana initially received probation for her conviction for writing bad checks and forgery. She was incarcerated only when she violated her probation by coming to Las Vegas without permission from her probation officer — and only after her disgruntled boyfriend reported her to authorities. Diana’s children were taken into state custody not directly because of her conduct, but rather because they were abused by Larry, with whom she requested the children not be placed. Though her incarceration prevented her from being available to parent her children, no other factors weigh in favor of imposing the “civil death penalty” on her. Thus, we decline to do so. Accordingly, we reverse the order of the district court terminating Diana’s parental rights.
 

 [1]
 

 Later, Diana and Larry both voluntarily relinquished their rights to C.E.P. in order to free the child for adoption by the child’s foster parents, with whom the child had bonded.
 

 [2]
 

 Diana’s sentence expired in March 2002.
 

 [3]
 

 Matter of Parental Rights as to N.J.,
 
 116 Nev. 790, 801, 8 P.3d 126, 133 (2000).
 

 [4]
 

 U.S. Const, amend XIV.
 

 [5]
 

 Troxel v. Granville,
 
 530 U.S. 57, 66 (2000) (plurality opinion) (citing
 
 Stanley
 
 v.
 
 Illinois,
 
 405 U.S. 645, 651 (1972)).
 

 [6]
 

 In re H.G.,
 
 757 N.E.2d 864, 871 (Ill. 2001).
 

 [7]
 

 Matter of N.J.,
 
 116 Nev. at 795, 8 P.3d at 129 (quoting
 
 Smith v. Smith,
 
 102 Nev. 263, 266, 720 P.2d 1219, 1220 (1986),
 
 overruled on other grounds by Matter of N.J.,
 
 116 Nev. 790, 8 P.3d 126).
 

 [8]
 

 Id.
 
 (quoting
 
 Drury v. Lang,
 
 105 Nev. 430, 433, 776 P.2d 843, 845 (1989)).
 

 [9]
 

 Id.
 
 at 801, 8 P.3d at 133;
 
 see
 
 NRS 128.105.
 

 [10]
 

 Matter of N.J.,
 
 116 Nev. at 795, 8 P.3d at 129 (quoting
 
 Kobinski v. State,
 
 103 Nev. 293, 296, 738 P.2d 895, 897 (1987)).
 

 [11]
 

 NRS 128.109(2); NRS 432B.553(2) (providing that if the child has been placed outside the home for fourteen of any twenty consecutive months, the best interests of the child must be presumed to be served by termination of parental rights).
 

 [12]
 

 NRS 128.0126.
 

 [13]
 

 Champagne v. Welfare Division,
 
 100 Nev. 640, 652, 691 P.2d 849, 857 (1984),
 
 overruled on other grounds by Matter of N.J.,
 
 116 Nev. 790, 8 P.3d 126.
 

 [14]
 

 Matter of Parental Rights of Montgomery,
 
 112 Nev. 719, 729, 917 P.2d 949, 956 (1996) (quoting
 
 Champagne,
 
 100 Nev. at 652, 691 P.2d at 857),
 
 superseded by statute on other grounds as recognized by Matter of N.J.,
 
 116 Nev. 790, 8 P.3d 126.
 

 [15]
 

 Id.
 

 [16]
 

 See, e.g., Johnson v. Arkansas Dep’t of Human Services,
 
 82 S.W.3d 183 (Ark. Ct. App. 2002) (holding that the fact the parent was incarcerated was not dispositive of the termination issue but was one factor to be considered);
 
 In re Dependency of J.W.,
 
 953 P.2d 104 (Wash. Ct. App. 1998) (holding that imprisonment alone does not necessarily justify termination of parental rights but is relevant to the inquiry);
 
 In the Matter of R.P.,
 
 498 N.W.2d 364 (S.D.1993) (holding that incarceration by itself is not sufficient reason to terminate parental rights but may be a factor in the decision).
 

 [17]
 

 See In re Dependency of J.W.,
 
 953 P.2d at 109 (holding that an incarcerated parent’s inability to perform his or her parental obligations is relevant, along with the nature of the parent’s crimes and the parent’s conduct before being imprisoned);
 
 In re P.O.M.,
 
 566 S.E.2d 334, 336-37 (Ga. Ct. App. 2002) (holding that “[although criminal conviction and incarceration do not always compel termination ... [it will suffice] when adequate aggravating circumstances are shown to exist — such as failure to comply with goals for family reunification or failure to provide parental care and support”);
 
 In re Interest of Brettany M.,
 
 644 N.W.2d 574, 587-88 (Neb. Ct. App. 2002) (holding that “incarceration may not be utilized as the sole ground for termination of parental rights” but that “it is proper to consider a parent’s inability to perform his parental obligations because of imprisonment, the nature of the crime committed, as well as the person against whom the crime was perpetrated”).
 

 [18]
 

 See
 
 NRS 128.105;
 
 see also Matter of Parental Rights as to Q.L.R.,
 
 118 Nev. 602, 54 P.3d 56 (2002) (holding that “voluntary conduct resulting in incarceration does not alone establish an intent to abandon a minor child” for termination of parental rights).
 

 [19]
 

 If the parent or parents fail to substantially comply with a reunification plan within six months of a child’s placement or plan commencement, the failure to comply is evidence of failure of parental adjustment.
 

 [20]
 

 See Champagne,
 
 100 Nev. at 652, 691 P.2d at 857.
 

 [21]
 

 If a child has resided outside the home for fourteen of any twenty consecutive months, it “must be presumed that the parent or parents have demonstrated only token efforts to care for the child.”
 

 [22]
 

 If the parent or parents fail to substantially comply with a reunification plan within six months of a child’s placement or plan commencement, the failure to comply is evidence of failure of parental adjustment.