IN THE MATTER OF PARENTAL RIGHTS AS TO A.G.

WASHOE COUNTY DEPARTMENT OF SOCIAL SERVICES, APPELLANT, *v.* KORY L.G., RESPONDENT.

No. 60071

February 28, 2013                                  295 P.3d 589

*Richard A. Gammick*, District Attorney, and *Janice Anne Hubbard*, Deputy District Attorney, Washoe County, for Appellant.

*Jeffrey Friedman*, Reno, for Respondent.

Before the Court En Banc.

# OPINION

By the Court, Douglas, J.:

In this appeal, we consider whether a parent of a child placed into state custody and made the subject of a dependency proceeding, based on the neglectful actions of the other parent, is required to comply with a case plan and accept services under NRS 432B.560 for purposes of reunification, when that parent has not been found to have neglected the child (nonoffending parent).[1] In connection with these circumstances, we must also determine whether presumptions that arose in the dependency proceeding should operate against the parent in a subsequent action to terminate his parental rights.

We conclude that keeping the child from the custody of the parent who is not the subject of the dependency proceeding violates the parent's fundamental constitutional rights to parent his child, when the child was not removed from the home because of his conduct, there were no substantiated findings that he had neglected the child, and the petition for neglect was dismissed as to him. Therefore, the presumptions favoring termination of parental rights under NRS 128.109, which arose from the child being placed outside the home in the dependency proceeding, do not apply to respondent, and the district court correctly concluded that appellant failed to establish parental fault and that terminating respondent's parental rights is in the child's best interest. Accordingly, we affirm the district court's order.

## FACTS

This case comes to us after two-year-old A.G. was placed into the protective custody of appellant Washoe County Department of Social Services in May 2009, after the child was found at a campsite with her mother Rachael L., who was extremely intoxicated. This was not the family's first involvement with Social Services.

Social Services had previously been contacted by the maternal grandmother over concerns that she had for A.G. because of Rachael's drug use. At a meeting with Rachael around one week before the night in question, the social worker noted that Rachael was unemployed, her food stamps had run out, and her drug screen had come back positive for methamphetamine and marijuana. The social worker scheduled a follow-up home visit with Rachael to discuss the drug screen and possible services.

---

[1]Nonoffending parent doctrine. Vivek S. Sankaran, *Parens Patriae Run Amuck: The Child Welfare System's Disregard for the Constitutional Rights of Nonoffending Parents*, 82 Temp. L. Rev. 55, 73-74 (2009).

The night before the scheduled home visit, however, Rachael took A.G. to a camping party at Pyramid Lake. Rachael had a history of drug and alcohol use as well as suicidal thoughts, and she had made statements to relatives that she believed A.G. was going to be taken into custody the following day, and she wanted to spend one last night with her and "show her a good time." Based on concerns over Rachael and A.G.'s welfare, the maternal grandmother called authorities. In responding to the call, the police found A.G. with Rachael at the campsite.

A.G.'s father, respondent Kory L.G., was not present at the time of this incident, and was in no way involved in the events that led to A.G's removal from Rachael's custody. In fact, Kory and Rachael were separated at the time. Kory primarily cared for A.G. since the child's birth, and she had been well cared for. At the time of A.G.'s placement in protective custody, however, she had been in Rachael's care for about a month because Rachael had obtained a temporary protective order (TPO) against Kory in April 2009. Kory and Rachael's relationship had been tumultuous at best, and the TPO was based on an alleged physical altercation that occurred between Kory and Rachael in front of the child, when Kory went to retrieve A.G. after a visit with Rachael. The TPO initially prohibited Kory from having contact with Rachael and A.G.

Despite Kory's lack of involvement in the events leading to A.G.'s removal, shortly after the child was removed from Rachael's custody, but before the protective custody hearing and the appointment of counsel for Kory, Social Services required Kory to submit to a drug test, for which he complied and tested positive for marijuana and methamphetamine.

An initial protective custody hearing was conducted before a juvenile master to determine whether A.G. was a child in need of protection. At the hearing, the master found that there was reasonable cause to believe that it was contrary to A.G.'s welfare to remain in Rachael's home because of her intoxication while caring for A.G. It was further determined that the child could not be placed with Kory because of the TPO. The master granted Social Services the discretion to temporarily place A.G. with appropriate relatives or in foster care. The child was placed in foster care.[2]

Social Services subsequently filed a petition for a hearing against both parents, alleging that A.G. was in need of protection from neglect under NRS Chapter 432B. An adjudicatory hearing was conducted during which Rachael submitted to the allegations, which included her drug use, that her home was not in a suitable condition for the child, that she was unable to provide for A.G.'s

_____

[2]Sometime after A.G.'s placement in protective custody, Kory divorced Rachael and sought custody of A.G. At the termination trial, Rachael testified that she was willing to relinquish her parental rights, and she is not a party to this appeal.

needs, and that she was intoxicated at the time of A.G.'s removal. The allegations as to Kory included only the TPO. Through counsel, Kory denied the allegations of neglect. The master sustained the allegations as to Rachael and found that A.G. was a child in need of protection and set a dispositional hearing as to Rachael. Because Kory had denied the allegations, the court set the matter for an evidentiary hearing as to him.

In July 2009, before the evidentiary hearing, Kory and Social Services met and reached an agreement to dismiss the petition for a hearing as to Kory. The stipulation to dismiss was placed on the record, and the master filed findings and recommendations reciting the stipulation and vacating the evidentiary hearing. Nevertheless, Social Services filed a case plan and service agreement, which Kory did not sign. Because Kory had tested positive in a drug screening, the case plan included requirements that Kory submit to random drug screens and submit to a substance abuse evaluation and that he undergo a domestic violence evaluation. That same month, a dispositional hearing was held for Rachael, during which Kory requested that A.G. be placed with him. By this time, the TPO against Kory had been modified to allow Kory to have contact with A.G., and he argued that he had challenged the sufficiency of the TPO and that the matter was pending in another court.

Following the stipulation to dismiss the petition between Social Services and Kory, and the dispositional hearing for Rachael, the master found that A.G. was a child in need of protection under NRS 432B.330 as to Rachael. The master further denied the child's placement with Kory, approved A.G.'s placement in family foster care, and recommended that legal custody of A.G. remain with Social Services. The master also recommended that Kory comply with his case plan and ordered him to pay child support. Kory did not file an objection to these recommendations. Ultimately, the juvenile court adopted the master's recommendations by order on July 29, 2009. Kory was granted supervised visitation with A.G., which he exercised on a regular basis. In August 2009, the TPO was dismissed based on insufficient evidence.

With the TPO and the petition for a hearing having both been dismissed, Kory filed a motion in the juvenile court to terminate Social Services' action and return the child to him or begin reunification with unsupervised home visits. After a hearing in October 2009, the master denied the motion, recommending that A.G. remain in the physical and legal custody of Social Services. The master found that although the TPO had been dismissed, there was still an obligation to determine whether Kory was a safe placement for A.G. The master stated that the primary issue preventing unsupervised visits was its inability to determine the extent of Kory's drug use and whether he could abstain from substance use while

caring for A.G. The master noted that Kory had recently tested negative in a September 2009 drug screen but the master could not determine Kory's abstinence between May and September 2009, because Kory had not taken drug tests during that time. Although the master recommended that Kory's motion for immediate placement be denied, the master concluded that A.G. could be safely placed with Kory if he was not actively using drugs, and recommended that Kory submit to a substance abuse evaluation and continue to submit to drug screens. Kory did not file any objection to the recommendations, and the juvenile court entered an order affirming and adopting the master's recommendations. Social Services retained custody of A.G., she was moved from foster care to live with her maternal grandmother, and Kory continued supervised visits.

Six months later, a permanency hearing was held, and the master approved a "permanency plan of reunification with Kory . . . together with a concurrent plan of termination of parental rights followed by adoption." The master was persuaded by Kory's argument that his progress on the case plan had been impeded by a lack of communication and specificity regarding the services he was expected to complete. The master ordered Kory to enter into a revised case plan with Social Services, which included more detailed terms regarding visitation, weekly drug testing, counseling services and monitoring, and communications. Social Services filed an objection challenging the master's authority to rework Kory's case plan; the juvenile court denied the objection and remanded the case to the master for further proceedings. On remand, the master ordered Kory to comply with the revised terms of the case plan.

Another six months passed, and a second permanency hearing was conducted, after which the master found that despite extensive modification to Kory's case plan, he had not been in compliance with the plan because he failed his drug test, failed to communicate with Social Services, and failed to attend any counseling or substance abuse treatment. The master did find that Kory had maintained a fairly consistent visitation schedule with A.G. The master recommended A.G.'s continued placement with the maternal grandmother, approved a permanency plan of termination of parental rights followed by adoption, and recommended that Social Services be relieved of providing further reunification efforts with the parents. Kory objected to the recommendation for termination of parental rights. He argued that he had provided good care to A.G. before her removal from Rachael's custody and that Social Services had not shown that he used drugs to an extent that would render him unable to responsibly and capably care for A.G. Not persuaded by Kory's arguments, the juvenile court affirmed the

master's findings and recommendation for termination of Kory's parental rights.

Social Services then filed a petition in the district court to terminate Kory's parental rights to A.G. At that point, A.G. had been in the custody of Social Services for 18 months and Kory had not substantially complied with his case plan. This triggered the presumptions for termination under NRS 128.109, where the child has been out of the home for 14 of any 20 consecutive months and where the parent has failed substantially to comply with services for reunification within 6 months. Thus, Social Services argued that it must be presumed that Kory had provided only token efforts and had failed to adjust his conduct, and that termination was in A.G.'s best interest. In addition to the presumptions, Social Services further argued that the facts affirmatively established parental fault and that the child's best interest would be served by termination.

Following a three-day bench trial, the district court denied the petition, finding that the presumptions did not apply and that Social Services had otherwise failed to demonstrate parental fault or that termination was in A.G.'s best interest. The court explained that its decision was based on Kory's status as a nonoffending parent, which it noted is an issue that this court has not previously addressed. Social Services now appeals from the order denying its petition to terminate Kory's parental rights.

## DISCUSSION

### Legal presumptions

The action to terminate Kory's parental rights was preceded by the separate dependency proceeding instituted by Social Services under NRS Chapter 432B to protect A.G. from abuse or neglect by the person responsible for the child's care, in this case Rachael. Because events that occurred in that dependency proceeding gave rise to certain legal presumptions under both the abuse and neglect statutes, NRS Chapter 432B, and the termination of parental rights statutes, NRS Chapter 128, which were applied against Kory in the case to terminate his parental rights, we begin by briefly reviewing the legal framework of the dependency proceeding and how the presumptions arose.

#### Dependency proceedings

In Nevada, the juvenile court has exclusive jurisdiction in proceedings concerning a child who is or may be a child in need of protection. *See* NRS 432B.410(1); *see also* NRS 432B.050; NRS 62A.180. A child is in need of protection if, among other things,

"[t]he child has been subjected to abuse or neglect by a person responsible for the welfare of the child." NRS 432B.330(1)(b). An agency that provides child welfare services must file a petition in the juvenile court alleging that a child is in need of protection. *See* NRS 432B.490; NRS 432B.510. When the petition alleges abuse or neglect by only one parent, the other parent nonetheless has constitutional protections and must be treated individually. *See* NRS 432B.457 (requiring that each parent be notified of any plan for the child's temporary or permanent placement); NRS 432B.510(4)(c) (stating that the petition for hearing must include the names of the child's parents); NRS 432B.520(1) (requiring that the parent be notified of the hearing on the petition if the child is in the custody of a nonparent). Due process requires that each parent is entitled to a hearing before being deprived of the custody of his or her child. *See Stanley v. Illinois*, 405 U.S. 645 (1972); *cf. In re Doe*, 465 A.2d 924, 931 (N.H. 1983) (noting that fundamental liberty interests prohibit imputing one parent's conduct to terminate the parental rights of the other parent).

Shortly after the child is placed into protective custody, the court conducts an adjudicatory hearing and, if the allegations in the petition are denied by the person responsible for the child, an evidentiary hearing on the petition must be conducted. *See* NRS 432B.530. "If the court finds that the allegations in the petition have not been established, it shall dismiss the petition" and order the child's immediate release from protective custody. NRS 432B.530(5). If the juvenile court finds that the child is in need of protection, the court may make a number of dispositions, including allowing the child to remain with a parent or placing the child with a nonparent. *See* NRS 432B.530(5); NRS 432B.550. If the child is placed outside the home, the agency must make reasonable efforts to reunify and preserve the family of the child, with the child's health and safety being a paramount concern. *See* NRS 432B.393(1) and (2). The agency must submit a plan concerning placement of the child, including a description of services to be provided to the person responsible for the child and to the child in order to facilitate reunification or to ensure a permanent placement for the child. NRS 432B.540(2)(b). The juvenile court may also order "[t]he child, a parent or the guardian to undergo such medical, psychiatric, psychological, or other care or treatment as the court considers to be in the best interests of the child." NRS 432B.560(1)(a).

Within 12 months after the initial removal of the child from the home, and annually thereafter, the juvenile court must conduct a dispositional hearing to review the plan for permanent placement of the child and to determine whether the agency has made reasonable efforts to finalize the child's permanent placement.

NRS 432B.590(1)(a) and (3); *see also* NRS 432B.553(1). The court may consider whether the child should be returned to the parents or whether termination of parental rights proceedings should be instituted under NRS Chapter 128, so that the child can be placed for adoption. NRS 432B.590(3)(b). If the child has been placed outside of the home for 14 of any 20 consecutive months, "the best interests of the child must be presumed to be served by the termination of parental rights." NRS 432B.590(4).

### Termination of parental rights proceedings

If a parental termination proceeding is instituted against a parent, the petitioner must establish by clear and convincing evidence that parental fault exists and that the child's best interest would be served by termination of parental rights. NRS 128.105. Parental fault can be established by findings that the parent's conduct constitutes abandonment, neglect, unfitness, failure of parental adjustment, risk of injury, or token efforts. NRS 128.105; *Matter of Parental Rights as to D.R.H.*, 120 Nev. 422, 428-33, 92 P.3d 1230, 1234-37 (2004). In addition to affirmative findings, certain presumptions can arise to establish parental fault and that the child's best interest would be served by termination. In this regard, when a child has been placed outside his or her home under NRS Chapter 432B for 14 of any 20 consecutive months, "it must be presumed that the parent or parents have demonstrated only token efforts to care for the child." NRS 128.109(1)(a). These token efforts demonstrate parental fault and give rise to the presumption that termination of the parent's parental rights is in the child's best interest. NRS 128.109(1)(a) and (2). Another presumption, failure of parental adjustment, arises when the parent fails to substantially comply "with the terms and conditions of a plan to reunite the family within 6 months after the date on which the child was placed or the plan was commenced, whichever occurs later." NRS 128.109(1)(b); NRS 128.105(2)(d). These presumptions are rebuttable and once established, the burden shifts to the parent to overcome the presumptions. *Matter of Parental Rights as to J.L.N.*, 118 Nev. 621, 625-26, 55 P.3d 955, 958 (2002). It is these presumptions that are at issue in this case.

In denying the petition to terminate Kory's parental rights, the district court recognized that because Kory was not responsible for A.G.'s removal from the home and Kory had never been found to have abused or neglected A.G., he had a constitutionally protected right to the custody of his child as a nonoffending parent. The district court defined a nonoffending parent as "an individual against whom no allegations of abuse, neglect or unfitness have been substantiated, and whose only proven 'fault' is to have had a

child in common with a parent from whom the child was removed." Thus, the district court concluded that the child's removal from the home and Kory's failure to comply with the case plan could not be used as a basis for presuming parental fault in the termination proceeding and that Social Services otherwise failed to carry its burden of establishing that termination was in A.G.'s best interest.

On appeal, Social Services argues that once a child is found to be a child in need of protection based on the conduct of only one parent, the juvenile court may take jurisdiction over that child even if there is a noncustodial parent available to take custody. Social Services asserts that it has an obligation to ensure the health and safety of the child, and to investigate a proper placement, and that Kory was not a proper placement in this case. According to Social Services, the juvenile court may require the parent to comply with services under NRS 432B.560 to determine whether the parent is fit for placement and to facilitate reunification, and that Kory's failure to timely comply with his case plan gives rise to the presumptions for parental termination under NRS 128.109. Social Services argues that the presumptions arising from the neglect proceeding should have applied in this case to establish parental fault by Kory and that termination was in A.G.'s best interest.

While neither Nevada's statutes nor caselaw addresses the rights of the nonoffending parent, we take this opportunity to clarify the constitutional rights of a parent whose child is the subject of a dependency proceeding based on the conduct of the other parent, and against whom no allegations of abuse or neglect have been substantiated.

*A parent's constitutionally protected parental rights*

This court has consistently recognized that severing the parent-child relationship is an extreme measure and an exercise of awesome power. *Parental Rights of J.L.N.*, 118 Nev. at 625, 55 P.3d at 958; *Matter of Parental Rights as to N.J.*, 116 Nev. 790, 795, 8 P.3d 126, 129 (2000). Termination of parental rights implicates fundamental liberty interests of a parent's relationship with his or her child. *Parental Rights of D.R.H.*, 120 Nev. at 426-27, 92 P.3d at 1233. The procedures for terminating parental rights, and granting custody of a child to a nonparent, must be fundamentally fair. *Id.*; *Santosky v. Kramer*, 455 U.S. 745 (1982). Even when the fairness of the procedures afforded to the parents is not called into question, substantive due process nevertheless demands that the government have a basis for subjecting the parents to the procedures in the first instance. *Licari v. Ferruzzi*, 22 F.3d 344, 347 (1st Cir. 1994) (recognizing that substantive due process tenet, which

ensures that government action is not arbitrary, regardless of whether the procedures afforded were fair).

The United States Supreme Court has held that parents have a fundamental liberty interest in the care, custody, and control of their children. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *see also In re Parental Rights as to C.C.A.*, 128 Nev. 166, 169, 273 P.3d 852, 854 (2012). This liberty interest is protected by the Due Process Clause of the Fourteenth Amendment. *Troxel*, 530 U.S. at 65. It is presumed that fit parents act in the best interest of their children. *Id.* As long as parents adequately care for their children, there is ordinarily ''no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.'' *Id.* at 68-69. These substantive due process rights prohibit the government from depriving parents of the custody of their children without a finding of parental unfitness. *Stanley*, 405 U.S. 645 (holding that parents are constitutionally entitled to a hearing on parental fitness before children are removed from their custody).

In applying these constitutional principles to custody determinations that arise in dependency proceedings, other courts have recognized a preference for placing the child with a fit parent, where the child was removed from the home based on the conduct of the other parent. *See, e.g.*, *In re D.S.*, 52 A.3d 887 (D.C. 2012) (recognizing a parental preference in neglect proceedings in the absence of evidence that the parent is unfit or that granting custody to that parent would be detrimental to the children's best interest); *In Interest of M.M.L.*, 900 P.2d 813 (Kan. 1995) (recognizing that a parent's fundamental right to the care of his or her child may not be disturbed absent a finding of parental unfitness or substantial endangerment to the child's welfare); *Matter of Cheryl K.*, 484 N.Y.S.2d 476 (N.Y. Fam. Ct. 1985) (holding that when the child was removed from the home because of the father's actions, the mother, who had never been adjudicated an unfit parent, had a superior right to custody as against third parties). This preference is rooted in these constitutionally protected parental rights, as well as statutory dependency provisions that express a preference for keeping the child with his or her family. *See In re D.S.*, 52 A.3d at 894; *see also* NRS 432B.393(1) (providing that the agency shall make reasonable efforts to preserve and reunify the family). Additionally, the state's interest in protecting the welfare of children is served because, in the absence of findings of parental unfitness, a parent is presumed to make decisions in the best interest of his or her child. *See Troxel*, 530 U.S. at 65; *see also* NRS 432B.393(2)

(stating that the child's health and safety is a paramount concern in reunifying the family).

This leads us to the case at hand and whether Kory was afforded his constitutionally protected rights as a parent in this case. Nevada's statute requires a finding that the child has been abused or neglected only by "a person" responsible for the child's welfare, before the court can assume jurisdiction over the child. NRS 432B.330(1)(b). It does not require a finding that both parents have abused or neglected the child. Thus, in this case, the juvenile court properly had jurisdiction over A.G. based on the mother's neglectful conduct.

The problem arose, however, when the juvenile court required Kory to comply with a case plan for reunification after the petition for neglect had been dismissed as to him and denied his request to have the child returned to his care. That decision also resulted in the child being outside of Kory's home for 14 of any consecutive 20 months, and because Kory failed to complete the case plan, gave rise to the presumptions under the termination statute that parental fault existed and that it was in A.G.'s best interest to terminate Kory's parental rights. Social Services argues that, in light of its concerns over Kory's substance abuse, the juvenile court had authority to order Kory to complete a case plan under NRS 432B.560, which provides that the court may order "a parent . . . to undergo such medical, psychiatric, psychological, or other care or treatment as the court considers to be in the best interests of the child." While NRS 432B.560 may allow the juvenile court to order services for a parent, it does not allow the court to require the noncustodial parent to complete a case plan for reunification under the circumstances presented here.

In this case, A.G. was taken into protective custody because of the mother's neglect and not because of any neglect by Kory. Kory had been the primary caretaker to A.G. for most of her life, and she had been well cared for. Although A.G. could not be immediately placed with Kory because of the TPO, the protective order was quickly modified to allow contact between Kory and A.G., and was later dismissed altogether for lack of evidence. Thus, the predicate for the neglect petition as to Kory no longer existed. Aside from the TPO, the petition contained no other allegations of neglect by Kory, and Social Services never substantiated any. Indeed, Social Services agreed to dismiss the neglect petition as to Kory within two months after it was filed.

Despite that dismissal, Social Services submitted a case plan for Kory, and over the next 18 months, the court required Kory to comply with the identified services based upon concerns over

Kory's drug use. These concerns, however, were unrelated to the initial basis for the neglect petition against Kory (*i.e.*, the TPO), but instead, arose because of a drug screen given to Kory before the protective custody hearing and even before Kory had counsel. For months thereafter, A.G. was kept from Kory's custody not because of any findings of neglect by Kory, but because the juvenile court could not determine the nature and extent of Kory's drug use or whether it would affect his ability to parent the child based upon Kory's inconsistent compliance with the drug screening and the other terms of the case plan—a case plan that Kory should not have been required to complete in the first place.

While we recognize that the child's health and safety is a paramount concern in the government's efforts to preserve and reunify the family unit, it must be balanced with the protection of a parent's constitutional rights. NRS 432B.393(1) and (2); *see Matter of Parental Rights as to N.J.*, 116 Nev. 790, 801-02, 8 P.3d 126, 133-34 (2000) (recognizing that in parental termination proceedings, the fundamental liberty interest of parents must be balanced with society's interest in protecting the welfare of children). Social Services has an obligation to ensure the safety and well-being of the child, and it has the authority under NRS Chapter 432B to determine whether it is safe to place the child with the parent who was not responsible for the abuse or neglect that brought the child into Social Services' purview. Thus, if Social Services had concerns over Kory's drug use and its effect on his ability to care for A.G., Social Services should have maintained a petition for neglect as to Kory and sought to substantiate allegations of Kory's neglect. *See* NRS 432B.330. As the district court correctly recognized, requiring Social Services to maintain a petition and prove neglect by Kory protects the due process rights of the parent's relationship with his child, while also serving the government's interest in protecting the child's welfare if there is an adequate basis for concern. A parent's fundamental liberty interest in the care, custody, and control of his child does not "simply evaporate" because the parent has not been a model parent or may have lost temporary custody of his child to Social Services. *Stantosky*, 455 U.S. at 753.

Because of the constitutional violation that kept A.G. from Kory's custody in the dependency proceeding, we conclude that the presumptions of token efforts and failure of parental adjustment under NRS 128.109 cannot apply against Kory in the parental termination case. Those presumptions arose because A.G. was placed outside of the home for 14 out of 20 consecutive months, NRS 128.109(1)(a) and (2), and because Kory failed to comply with the case plan within six months, NRS 128.109(1)(b), but these cir-

cumstances would not have occurred if it were not for him being subjected to the case plan. Applying those presumptions here would be fundamentally unfair.

A.G. was removed from the home because of the mother's actions, and Social Services never substantiated findings that Kory had neglected A.G. When a parent did not cause the child's removal and was never found to have neglected the child, the statutory presumptions cannot apply to support the termination of the parent's rights. Thus, the district court properly concluded that these presumptions should not apply to terminate Kory's parental rights.

*Termination was not established by clear and convincing evidence*

In the absence of any presumptions, the district court also found that Social Services failed to establish by clear and convincing evidence that termination of Kory's parental rights was warranted. *In re Parental Rights as to C.C.A.*, 128 Nev. 166, 169, 273 P.3d 852, 854 (2012); *see also Santosky*, 455 U.S. at 769. The district court found that Social Services did not prove parental fault on any of the grounds alleged, including parental unfitness, failure of parental adjustment, and the demonstration of only token efforts. *See* NRS 128.105(2). The district court further found no evidence that Kory had abused or neglected A.G., or that Kory's drug use rendered him unable to provide a safe and caring home for A.G. *See* NRS 128.106. The district court found that Kory should never have been required to comply with the case plan; and to the extent that he ever orally agreed to comply or partially performed some of the plan's components to facilitate reunification, such an agreement had a coercive element and was an improper basis for termination.

As for the child's best interest, the district court took into account the comparative analysis between the child's family and the foster family, when the child has been living in a foster home, as well as A.G.'s attachment to Kory and her maternal grandmother. *See* NRS 128.105; NRS 128.108. The district court found that while A.G. had bonded with her maternal grandmother, A.G. still had "considerable love, affection, and emotional ties" with Kory. The court further found that Kory "has the resources, ability, and desire to care for [A.G.]'s proper physical, mental, and emotional growth and development." We conclude that the district court's decision is supported by substantial evidence and that termination of Kory's parental rights is not in A.G.'s best interest. *See Matter of Parental Rights as to A.J.G.*, 122 Nev. 1418, 1423, 148 P.3d 759, 763 (2006) (recognizing that the district court's decision to termi-

nate parental rights will be upheld by this court if it is supported by substantial evidence).

## CONCLUSION

We conclude that Kory had constitutionally protected rights in the dependency proceeding and could not be compelled to comply with a case plan for reunification with A.G. when Kory was not responsible for her removal from the home, Kory had never been found to have abused or neglected A.G., and the petition for neglect was dismissed as to Kory by agreement of the parties. Thus, the presumptions that arose from A.G.'s lengthy placement in foster care could not be used against Kory (nonoffending parent) in the parental termination proceeding to establish either parental fault or that the child's best interest would be served by termination. Further, Social Services otherwise failed to demonstrate that termination of Kory's parental rights was warranted. Accordingly, we affirm the district court's order denying the petition to terminate Kory's parental rights.

PICKERING, C.J., and GIBBONS, HARDESTY, PARRAGUIRRE, CHERRY, and SAITTA, JJ., concur.