An unpublished order shall not be regarded as precedent and shall not be cited as legal authority. SCR 123.

IN THE SUPREME COURT OF THE STATE OF NEVADA

IN THE MATTER OF PARENTAL
RIGHTS AS TO: R.Y.

No. 60791

CLARK COUNTY DEPARTMENT OF
FAMILY SERVICES,
Appellant,
vs.
ANNE O.; AND GABRIEL Y.,
Respondents.

**FILED**

MAY 0 8 2014

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY S. Young
DEPUTY CLERK

*ORDER REVERSING AND REMANDING WITH INSTRUCTIONS*

This is an appeal from a district court order denying the Clark County Department of Family Services' petition to terminate parental rights. Eighth Judicial District Court, Family Court Division, Clark County; Frank P. Sullivan, Judge.

This case presents the question of the circumstances under which a court may terminate the parental rights of parents who are imprisoned awaiting trial for the capital murder of a child. We hold that where a parent is imprisoned pending a criminal trial, the petitioner may introduce evidence of the crime charged to the extent the commission of the crime bears on the existence of parental fault, and that clear and convincing evidence that the parent committed such a crime may appropriately serve as a basis to terminate his or her parental rights.

I.

When R.Y. was 28 days old the State arrested her parents, respondents Anne O. and Gabriel Y., for the brutal murder of a 17-year-old child, Nichole. According to the State's allegations, Nichole had lived with Anne and Gabriel in their Las Vegas apartment and was pimped by them. To escape detection for Nichole's murder, Anne and Gabriel allegedly removed Nichole's teeth, cut out her tattoos, and buried her in a

14-14912

shallow desert grave. The murder allegedly occurred just days after R.Y. was born.

R.Y. has been in foster care since Anne's and Gabriel's arrest, living with her maternal aunt and uncle in Tennessee. It is now more than five years later and, due to a series of motions and unexplained delays, Anne and Gabriel remain in jail pending their separate capital murder trials. Their trials currently are scheduled to begin in August and September 2014.

Several years after the criminal charges were brought, appellant Clark County Department of Family Services (DFS) filed a petition to terminate Anne and Gabriel's parental rights. The petition was filed so that R.Y.'s maternal aunt and uncle, whom she calls "Mom" and "Dad," could permanently adopt her. After granting repeated motions for continuance of the parental rights termination hearing pending the outcome of Anne's and Gabriel's criminal cases, the district court ruled on the merits of DFS's petition.

To terminate parental rights and bring R.Y.'s permanent placement to fruition, DFS needed to prove by clear and convincing evidence (1) that R.Y.'s best interest would be served by the termination and (2) "parental fault." NRS 128.105; *In re Parental Rights as to A.G.*, 129 Nev. ___, ___, 295 P.3d 589, 594 (2013). The district court found, and the parents accept, that DFS carried its burden of proving that R.Y.'s best interests would be served by termination. But, the district court found that DFS had failed to demonstrate parental fault and therefore declined to terminate Anne's and Gabriel's parental rights. DFS appeals.

II.

DFS focused its arguments in the district court on the grounds for parental fault enumerated by NRS 128.105(2), including neglect,

failure of parental adjustment, and token efforts. As a result, the district court focused on the parents' participation in counseling programs available to them in jail. It found that Gabriel had attended "over fifty (50) marriage and family therapy courses, a life skills course, and an additional forty (40) other courses" and that Anne "attended over thirty-five (35) parenting classes, a chemical dependency class, approximately seven (7) anger management classes and underwent a psychological assessment." The district court findings also enumerated the parents' attempts to contact their daughter, noting that Gabriel "has sent [R.Y.] six (6) written communications and has made several requests for pictures of [her]" and that Anne "has sent two (2) to three (3) letters a month . . . and [had] two (2) face to face visits" with the child over the years they have been incarcerated. The parties' appellate briefs similarly debate at length the sufficiency of Anne's and Gabriel's attempts to comply with their respective "case plans," the steps DFS outlined for them to be reunited with R.Y. The result of this discussion is a surreal incongruence between the horrifying facts underlying Anne and Gabriel's criminal charges, the reality of their extremely limited contact with their daughter, who only lived with them for nine days before being placed in a foster care setting that has since matured into an adoptive option, and DFS's asserted grounds for terminating their rights.

Standing alone, many of the grounds enumerated in NRS 128.105 are a poor fit for circumstances such as these. Thus, the district court correctly found that Anne and Gabriel did not "neglect" R.Y. because, while in jail, they do not have custody of her.[1] *Champagne v. Welfare Div.*

---

[1]Anne and Gabriel's incarceration alone cannot evince their neglect, else grounds would exist to terminate the parental rights of the 800,000 parents estimated to be incarcerated. *See* Deseriee A. Kennedy, Children,

*continued on next page...*

*of Nev. State Dep't of Human Res.*, 100 Nev. 640, 658, 691 P.2d 849, 862 (1984), *superseded by statute on other grounds, as stated in In re Termination of Parental Rights as to N.J.*, 116 Nev. 790, 8 P.3d 126 (2000). Similarly, their efforts in writing letters to and telephoning an infant and toddler who lives in Tennessee are not "token" since they are the best they can do, *compare In re N.J.*, 125 Nev. 835, 846, 221 P.3d 1255, 1263 (2009); but the efforts may be ineffective for any realistic purpose. And, we cannot say they have not abided by the educational goals DFS has set for them; it is just that those classes are far removed from the larger question of when, if ever, they may be released from custody to make a life with R.Y.[2]

But NRS 128.105 does not stand alone. Rather, it cross-references NRS 128.106 and NRS 432B.393(3). Thus, in determining whether parental fault exists "the court shall consider, *without limitation*" the grounds enumerated there, including, as relevant here, "[c]onduct toward *a* child of a physically, emotionally or sexually cruel or abusive nature." NRS 128.106(2) (emphasis added).

And, while NRS 128.106(6) specifies "[c]onviction" of a felony as one of the permissible bases for finding parental fault, which is not

---

*...continued*
*Parents & the State: The Construction of a New Family Ideology*, 26 Berkeley J. Gender L. & Just. 78, 85 (2011).

[2]We review the district court's determinations deferentially, so long as they are supported by substantial evidence and not affected by evidentiary or legal error. *In re N.J.*, 116 Nev. at 795, 8 P.3d at 129. Artificially limiting the facts to those unrelated to the murder charge, we cannot say that the district court erred. The problem lies in the district court's rejection of DFS's efforts, such as they were, to address the circumstances leading to Anne's and Gabriel's present incarceration.

applicable here, NRS 128.105(2) also permits a finding of fault based on a finding made pursuant to subsection 3 of NRS 432B.393. NRS 432B.393(3)(a)(1) augments the bases for termination of parental rights, allowing DFS to forego reasonable reunification efforts and thus apparently for the district court to base termination on the best interests of the child once a juvenile court makes a finding that a parent has "[c]ommitted, aided or abetted in the commission of, or attempted, conspired or solicited to commit murder or voluntary manslaughter. . . ." NRS 432B.393(3)(a)(1); *see also* NRS 432B.393(3)(a)(3) (dispensing with reunification efforts if the juvenile court finds the parent has "[c]aused the abuse or neglect of . . . another child in the household . . . so extreme . . . as to indicate that any plan to return the child to the home would result in an unacceptable risk to . . . the child). This evinces the drafter's recognition that under the extraordinary circumstances present here a petitioner need not await a conviction in criminal court given the probable delay and the risk of harm presaged by the seriousness of the charges, if substantiated even by less than proof beyond a reasonable doubt. *See also* NRS 128.105(2) (defining parental fault to include a risk of serious injury if the child is returned to the parents). Thus, viewed holistically the statutory scheme allows a court to address the obvious issue—that Anne and Gabriel may have engaged in conduct toward a child, Yegge, of a "physically, emotionally or sexually cruel or abusive nature" as the State alleges, that if a court found the State's allegations to be true this would be sufficient evidence of parental fault, and that no amount of family therapy, life skills, or anger management courses could negate the existence of fault on such grounds.

Given the presumption of innocence to which Anne and Gabriel are entitled, the existence of the State's criminal allegations is not

alone sufficient to establish parental fault. *See Haywood v. State*, 107 Nev. 285, 288, 809 P.2d 1272, 1273 (1991). Rather, DFS needed to present independent evidence of the underlying criminal conduct to satisfy its burden. *See In re Parental Rights as to J.L.N.*, 118 Nev. 621, 628, 55 P.3d 955, 960 (2002) (taking into account the parent's felony *conviction*); NRS 128.106 (stating that *conviction* for a felony may establish parental fault in some instances). According to the district court, it somewhat "constrained [DFS] in presenting its case by not allowing the admission of evidence . . . as [the court] was not inclined to allow the criminal trial to be presented." While we appreciate the district court's thought and candor, it went wrong on this point—DFS was entitled, if it saw fit, to present clear and convincing evidence sufficient to support that Anne and Gabriel engaged in "[c]onduct toward a child of a physically, emotionally or sexually cruel or abusive nature," NRS 128.106(2); *In re N.J.*, 116 Nev. at 801, 8 P.3d at 133 (or, if the juvenile court so found (we do not have that record) that Anne and Gabriel "[c]ommitted, aided or abetted in the commission of . . . murder," NRS 432B.393(3)(a)(1), which made reunification efforts unnecessary, and in turn established parental fault under NRS 128.105).

## III.

The record is largely devoid of any offerings of independent evidence by DFS of the crime with which Anne and Gabriel are charged. There are four notable exceptions.

First, DFS elicited testimony from a social worker that Gabriel said "Anne killed her . . . he just helped to bury the body," which the district court heard, then ordered stricken as hearsay, as to both Anne and Gabriel. As to Anne the exclusion was proper because she did not make, adopt, or authorize the statement, it was not made in furtherance of their

alleged conspiracy, and it was not made against Gabriel's interest because it tended to exculpate him in the murder by shifting blame to Anne. NRS 51.035(3)(a)-(e); NRS 51.345. But as to Gabriel the exclusion was legally unfounded and thus an abuse of discretion—it is not hearsay as to him because he is a party to the action and it was offered against him. NRS 51.035(3)(a).

In the appellate record there also appear two documents which, if properly admitted, may have been clear and convincing so as to establish parental fault: a police report indicating that the police followed Gabriel to the victim's grave site and that Anne told a third party she had strangled the victim[3]; and testimony by a witness at an evidentiary hearing for the criminal case establishing that Gabriel said he had a physical altercation with the victim immediately prior to her murder, that he admitted to removing her teeth, cutting off her tattoos, and disposing of her body, and that he had previously been acquitted of murder and was certain he could not "get away with [murder] . . . twice." But it is not clear whether DFS presented this evidence below, or if it was imported into the appellate record directly from the long-pending criminal proceedings. These items of evidence are not listed as exhibits in the district court parental termination action, though the district court expressed willingness to admit police reports if DFS submitted them. Nor did any witness lay a foundation for their admission—DFS indicated that it intended to call the arresting officer as a witness, but closed its case without so doing.

---

[3]Like Gabriel's statements to the police officer, Anne's out-of-court admissions to this third party may be admissible under NRS 51.345, but it is impossible to tell whether the transcript is admissible, or even was sought to be admitted, on the record we have.

But DFS's presentation appears to have been restricted by the district court. With regard to DFS's presentation of evidence supporting the criminal charges, the district court stated it was "not going to get into those issues with the criminal case pending on that. . . . I just don't want to go there." Yet, in seeming contradiction to that ruling, the district court stated that it was taking judicial notice of the "pending criminal case." On appeal, DFS suggests that the documents were admitted through this taking of judicial notice of the criminal proceedings. We cannot be certain whether this is so; the district court did not refer to or rely upon the documents in its only written order, noting simply that Anne and Gabriel "were arrested and subsequently charged with murder, conspiracy to commit murder, and first-degree kidnapping of a seventeen (17) year old female . . . ." Further confusing things, neither Anne nor Gabriel has moved to strike from the appellate record in this case documents drawn from their criminal case files, suggesting they acquiesce in DFS's position that we may properly consider them.

In any case, documents such as these from the criminal proceedings are not proper subjects for judicial notice. First, the "facts" contained in the documents are subject to reasonable dispute. NRS 47.130. Moreover, both documents include hearsay and "while court records may be sources of reasonably indisputable accuracy when they memorialize some judicial action, this does not mean that courts can notice the truth of every hearsay statement filed with the clerk." 21B Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* §5104 at 155 (2d ed. 2005). Thus, regardless of the origin of these documents, it does not appear that they are properly before this court. *See Carson Ready Mix, Inc. v. First Nat'l Bank of Nev.*, 97 Nev. 474, 476-77, 635 P.2d 276, 277-78 (1981).

Finally, DFS advocates that a negative inference should be drawn from the parents' taking of the Fifth Amendment in the parental termination proceeding. The parents counter that the district court should have continued or stayed the proceedings pending the outcome of their criminal case to avoid the necessity of their invocation. But we cannot say that the district court abused its discretion by finally denying the stay after it granted multiple motions for continuance and, at the time it made its determination in April 2012, the "commencement of the criminal proceeding [was not] set in the foreseeable future," and more than 18 months later, Anne's and Gabriel's criminal trial(s) have yet to begin. *See* NRS 128.055 (mandating that a court use its best efforts to ensure that termination proceedings are completed within six months).

As to the propriety of DFS's negative inference suggestion, the issue was not adequately vetted in the district court to make our consideration of it appropriate on this appeal. The Fifth Amendment to the United States Constitution provides, "No person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. There is a body of case law holding that the privilege of invoking the Fifth Amendment without consequence does not apply in parental termination hearings because, while significant, such proceedings are not criminal. *See, e.g., In Re Samantha C.*, 847 A.2d 883, 912-15 (Conn. 2004); *see also Balt. City Dep't of Soc. Servs. v. Bouknight*, 493 U.S. 549, 551, 555-56 (1990) (holding that a mother, the custodian of a child pursuant to a court order, could not invoke the Fifth Amendment privilege against self-incrimination to resist an order of the juvenile court to produce the child). Moreover, in Nevada, parental termination proceedings are civil in nature, *see* NRS 128.090(2), and in civil cases generally, a negative inference may arise from a witness's invocation of the Fifth Amendment where prima

facie evidence has been introduced of the fact the negative inference is being used to bolster. *See Aspen Fin. Servs., Inc. v. Eighth Judicial Dist. Court*, 128 Nev. ___, 289 P.3d 201, 209 (2012).

But here, while the social worker's testimony may have provided that predicate as to Gabriel, the district court erroneously struck that testimony and so did not consider either the social worker's testimony or the negative inference arguably arising from Gabriel's assertion of his Fifth Amendment privilege. The record also does not establish what comparable evidence was or was not admitted or considered by the district court against Anne. This issue deserves full development in and consideration by the district court, in light of our ruling that, given the long delays in the criminal proceedings, DFS may properly proceed with proof of facts relevant to the underlying criminal charges to support termination of parental rights.

## IV.

We empathize with all the parties to this case and their pleas for preservation of their constitutional rights and finality. But serious charges and serious consequences to both the parents and the child are involved. Given this, and absent a full evidentiary hearing, we decline to intrude on the traditional purview of the fact-finder and draw any conclusions as to the propriety of terminating Anne's and Gabriel's parental rights to R.Y. *Yamaha Motor Co., U.S.A. v. Arnoult*, 114 Nev. 233, 238, 955 P.2d 661, 664 (1998). Instead, in the interests of ensuring that each of these parties has the opportunity to present their case to the extent our evidentiary rules allow, we reverse and remand. In doing so, we instruct the district court as follows: (1) to require DFS to specify the factual and legal bases on which its seeks termination; (2) to specify the facts, if any, of which the district court takes judicial notice; (3) to conduct

a full evidentiary hearing, allowing in evidence of the parents' underlying crime if DFS confirms that it seeks termination of parental rights on this basis and it is admissible under ordinary rules of evidence; (4) to admit Gabriel's statement to his social worker against him, and only him, under 51.035(3); and (5) to exercise its sound discretion in deciding whether drawing a negative inference against either parent, pursuant to *Aspen,* is appropriate.

REVERSED AND REMANDED.

_____, C.J.
Gibbons

_____, J.
Pickering

_____, J.
Hardesty

_____, J.
Parraguirre

_____, J.
Douglas

_____, J.
Cherry

_____, J.
Saitta

cc:    Hon. Frank P. Sullivan, District Judge, Family Court Division
Clark County District Attorney/Juvenile Division
Special Public Defender
Law Office of Kristina Wildeveld
Eighth District Court Clerk

SUPREME COURT
OF
NEVADA

(O) 1947A